**PIGGLY WIGGLY CORPORATION v.
UNITED STATES.**

No. 46249.

United States Court of Claims.

Jan. 3, 1949.

John A. Osoinach, of Memphis, Tenn. (Robert Ash and Carl F. Bauersfeld, both of Washington, D. C., on the brief), for plaintiff.

William A. Stern II, of Washington, D. C., Asst. Atty. Gen. H. G. Morison, for defendant.

Before JONES, Chief Judge and HOWELL, LITTLETON, WHITAKER, and MADDEN, Judges.

HOWELL, Judge.

This is an action arising out of a contract dated February 22, 1943, between plaintiff and defendant, acting through the Quartermaster Corps, War Department, whereby plaintiff agreed to furnish and deliver 50,000 plywood lockers for a cost of $4.60 each, or a total of $230,000.00. On August 23, 1943, the parties entered into a supplemental agreement, which modified the delivery schedule in the original contract and extended the final date of delivery from August 31, 1943, to November 30, 1943. On September 30, 1943, pursuant to Article 12 of the contract (set forth in finding 3), the contract was terminated for the convenience of the Government. Prior to the effective date of termination, the plaintiff had delivered 45,027 of the lockers called for in the contract and the agreement was terminated as to the balance of 4,973 lockers.

Plaintiff seeks recovery on three sepa-rate claims in the aggregate amount of $15,403.82. The first claim is on an alleged breach of contract arising out of defendant's failure to make timely allocations of plywood from manufacturers. Plaintiff asks judgment for $4,034.43 on this claim. Plaintiff's second claim is to recover $4,567.32, which represents the additional cost of plywood due to an increase in the ceiling prices authorized by the Office of Price Administration after the contract was entered into. Plaintiff's third claim is for termination costs, expenses, and prospective profits on the unfinished portion of the terminated contract in the amount of $6,802.07. Defendant had allowed plaintiff the sum of $2,544.50 on its termination claim but plaintiff refused to accept that amount, and, pursuant to Section 13(b) of the Contract Settlement Act of 1944, 41 U.S.C.A. § 113(b), brings its suit in this court with respect to its termination claim. In addition, plaintiff asks judgment for certain legal and accounting fees incurred in connection with its suit in this court.

## Claim for additional cost of plywood panels bought at distribution warehouses

Plaintiff's first claim is for damages in the amount of $4,034.43 resulting from the alleged failure of defendant to make plywood panels available from manufacturers by allocation when needed. The amount of damages represents the increased cost to plaintiff of plywood purchased from distribution warehouses where plaintiff purchased the material in order to meet the contract delivery schedule. Plaintiff's bid was based on the price of plywood at the mills, which was 20% less than at the distribution warehouses.

Plaintiff alleges that defendant specifically obligated itself in the contract to make plywood available to the plaintiff from the manufacturers, and that its delay in so doing constituted a breach of the contract.[1]

In passing on plaintiff's claim we must first determine what defendant promised, either expressly or impliedly, to do, and

---

1 Plaintiff refers to George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70, in the Fuller case the specifications attached to the contract expressly

second, whether defendant delayed in carrying out its undertaking.

Plaintiff's bid contained the following statement:

Offering of making these boxes is contingent upon the supply of fir plywood required being made available through allocation to those plywood manufactureres making these type panels.

This statement contains two important elements: first, it expects the government to make the plywood available through allocation, and second, it expects such plywood to come only from manufacturers.

The government's letter accepting plaintiff's bid responded to plaintiff's condition quoted above, as follows:

This office will obtain for your suppliers of the plywood necessary for you to perform this contract, a release from the Chief of Engineers, in the event that any of your suppliers find that such action is necessary. If such a release is necessary, it is requested that such supplier wire this office the amount and description of board feet contracted for by you for your performance of the above numbered contract.

The above acceptance is clearly not in the terms of plaintiff's offer. At best it is a promise that the government would, upon request of plaintiff's suppliers, obtain releases to enable such suppliers to deliver the plywood to plaintiff. It does not promise to supply the plaintiff with plywood, nor does it promise that the supplier shall be the manufacturers of plywood rather than some other type of supplier. Plaintiff did not object to the form of defendant's acceptance. The formal contract contained no provision embodying the matters referred to.

Assuming (without deciding) the language in defendant's acceptance letter to be a contract commitment to obtain the necessary releases or allocations from suppliers designated by plaintiff, we now turn to the question as to whether or not defendant was guilty of delay in carrying out such commitment so as to damage the

plaintiff. After acceptance of its bid, plaintiff, equipped with a AA–1 priority, and without requesting defendant to make an allocation, attempted to purchase plywood directly from the western manufacturers. On being informed that no plywood was then available for shipment, plaintiff bought a carload of plywood from a distribution warehouse, in Chicago at a price approximately 20 percent higher than the mill price. On January 28, 1943, plaintiff asked the contracting officer at Memphis, Tennessee, to assist it in obtaining the plywood from the mills. The contracting officer assured plaintiff that every effort would be made to help it, and certain information was requested which plaintiff supplied. On February 27, 1943, one month following plaintiff's request, the Central Procuring Agency succeeded in obtaining a bid from a supplier and issued a purchase allocation in favor of plaintiff for 249,000 of the 1,062,400 square feet of plywood needed by plaintiff. Because of the acute shortage of plywood at that time and the large number of requests for allocations, the average time between a request and the issuance of an allocation was from 40 to 45 days. It thus appears that plaintiff's first allocation was issued in considerably less than the average time. In late April of that year, three additional allocations were issued for the balance of the plywood needed by plaintiff, one of which was cancelled on June 25th because the mill in question was unable to make delivery.

We see nothing in the facts just related indicating any delay on the part of the government in obtaining allocations of plywood for the benefit of plaintiff. Plaintiff, however, says that 25,000,000 feet of plywood per month was allocated in February or March 1943, to various government contractors. From this, plaintiff argues that defendant could have made the requested allocations in time to enable plaintiff to meet its deliveries promptly without resorting to purchases from warehouses. Plaintiff bases this argument on

provided that the government was to furnish plaintiff with certain models. This court held that the government must respond in damages for delays in furnishing the models, no sufficient reason for the delays having been shown by the government.

the premise that defendant was obligated to make allocations of plywood to plaintiff without regard to the needs of other contractors for this material. We find nothing in the contract nor in the government's acceptance of the plaintiff's bid to indicate any such unqualified obligation on the part of the government. That plaintiff's contract for the manufacture of lockers should have been favored above the many other war contracts requiring the use of plywood, would, we think, have been a most unusual circumstance. The entire record of the case contains no indication that such was the case.

The Central Procuring Agency accorded plaintiff the same treatment with respect to allocations as it gave to other contractors requesting plywood allocations. The demands for plywood at that time far exceeded the supply and in view of the large number of requests from government contractors, the Central Procuring Agency allocated plywood for plaintiff as soon as it was able to do so.

After the issuance of an allocation to a supplier, there was a normal delay of 6 weeks before delivery. In plaintiff's case, approximately ten weeks elapsed before any part of his first allocation was delivered. During that time plaintiff felt compelled to seek plywood from warehouses where allocation orders were not necessary but where the price was 20 percent higher than at the mills to which the allocations were directed. In all, plaintiff purchased 270,788 feet of plywood from distribution warehouses at the 20 percent increase in price. In so doing plaintiff presumably acted in the exercise of its business judgment, and without any assurances by the government that it would assume liability for the increased cost of such material.

We are unable to see how this delay in delivery, which was admittedly longer than usual, and did damage plaintiff, was in any way the fault of the government. The only delay for which the government could possibly be held liable, would be a delay in securing purchase allocations and in that

the government was not delinquent. It therefore appears that there is no basis for holding the government liable for the increased cost to plaintiff of plywood purchased from distribution warehouses.

We have not discussed defendant's further defense based on the fact that the priority system was a result of a sovereign act of the United States, because we have found that the government was guilty of no delay as to plaintiff within the framework of that system.

We have not dealt with the authorities cited by plaintiff, because we do not consider them applicable to the circumstances of this case.

### Claim for additional costs because of an increase in the ceiling price of plywood

Plaintiff's next claim is for $4,567.32 of added cost incurred as a result of an increase in the ceiling price of plywood during the term of the contract. Plaintiff had based its bid upon the ceiling price of plywood in effect at the time the contract was entered into. Plaintiff contends that the nation's price structure was under the absolute control of the government, through one of its agencies, the Office of Price Administration; that while plaintiff could not know that a change in price was contemplated, defendant must be deemed to have known this for, says the plaintiff, "under familiar legal principles the knowledge of one Government agency, as to impending or authorized changes in ceiling prices, should be imputed to the Government in all its dealings through all its agencies." [2] From this, plaintiff urges that the continued existence of the ceiling price of plywood at the time of the execution of the contract is a condition which must be read into the contract and that any change in such prices by another agency of the government constitutes a breach for which the government must respond in damages.

The government's defense to this claim is based on the theory that the act of the Office of Price Administration al-

---

[2] We are unfamiliar with the legal principle alluded to by plaintiff, and plaintiff fails to provide us with any authority for its statement. In view of our holding that the Government's act in changing the ceiling price is a sovereign act, we doubt the applicability of such a principle to this case, if it does exist.

leged to have harmed plaintiff, was an act of the Government in its sovereign capacity and not in its capacity as a contractor. Defendant refers us to Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, as authority for the fact that a change in ceiling prices by OPA is a sovereign act of the United States, and to Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736, for the proposition that the Government cannot be liable in its contractual capacity for its sovereign act.

We think the Government's defense is valid. The Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., providing for the establishment of the Office of Price Administration, and the control of prices, was a law of general application. . It is undoubtedly true that many persons having contracts both with the Government and with other private persons, suffered through its application unless their contracts expressly provided for adjustments in the contract price when costs were increased by changes in price ceilings. In Clemmer Construction Company, Inc. v. United States, 71 F.Supp. 917, 108 Ct.Cl. 718, this court held that the action of the War Manpower Commission in specifying the area in which plaintiff was performing its contract as one in which the forty-eight hour week should be worked, was a sovereign act, and that plaintiff could not recover its increased costs incurred through compliance with the order. As pointed out by defendant, United States v. Barlow, 184 U.S. 123, 22 S.Ct. 468, 46 L.Ed. 463; Clark v. United States, 6 Wall. 543, 73 U.S. 543, 18 L.Ed. 916, and George A. Fuller v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70, are inapplicable since in those cases the Government interfered with the contractor's operations in its capacity as a contractor, not as a sovereign.

Accordingly, we must conclude that plaintiff is not entitled to recover on this claim.

Claim for expenses and losses resulting from the termination of the contract

Finally, plaintiff claims an additional amount of $6,802.07 for various expenses and losses resulting from termination of plaintiff's contract.

On September 20, 1943, defendant notified plaintiff that, pursuant to Article 12, the Government was terminating the contract for its convenience as of September 30, 1943. Plaintiff took an inventory of supplies on hand on September 30th, and submitted a claim of $8,980.54 for alleged expenses and losses due to the termination. In accordance with the provisions of Article 12 of the contract, paragraphs (a), (b) and (c) (the entire article is set forth in finding 3 of our special findings of fact), defendant attempted to negotiate a settlement of plaintiff's claim and made three separate offers of settlement, the last in the amount of $3,300. Plaintiff rejected all three offers, and on June 26, 1944, defendant notified plaintiff that since all attempts to negotiate a settlement had failed, the contracting officer would determine the amount due plaintiff in accordance with the formula set forth in paragraph (d) of Article 12 of the contract. Plaintiff's books were examined by a Government auditor, on the basis of whose report the contracting officer made written findings of fact in which he determined that the amount due plaintiff as a termination claim was $2,544.50.

On August 31, 1944, pursuant to 41 U.S. C.A. § 113(a), defendant sent plaintiff a voucher for $2,290.05, representing 90% of the amount determined to be due. Plaintiff refused to accept the allowance and returned the voucher. Plaintiff later reduced its claim to $6,802.07 and sues for that amount.

On the date of termination of the contract, plaintiff had on hand materials necessary to complete the contract costing $8,168.63. This inventory included partially manufactured wooden parts costing $510.34, corrugated fiber parts bearing printed Government specifications costing $348.89, and the balance consisted of unprocessed plywood panels, paint, and hardware. Pursuant to an order of the contracting officer, plaintiff delivered to the Government a portion of the unprocessed hardware costing $1,013.98, and on November 14, 1944, defendant sent plaintiff a voucher for $1,-

021.72 in payment of this material. Plaintiff refused to accept this voucher and returned it to the contracting officer.

Prior to making his findings and determination, the contracting officer had authorized plaintiff to sell the remainder of the inventory of unused materials to third parties at specified prices. $7,319.20 received from such sales was designated as a disposal credit and was used to reduce the amount of the contracting officer's liability to plaintiff for the cost of such materials. There is no dispute regarding this disposal credit.

We shall now take up the various items in plaintiff's termination claim concerning which the parties are in dispute.

### Inventory

■ Discounts on purchases.—In computing the amount of compensation due plaintiff for the inventory on hand, defendant deducted the sum of $100.10 which represents discounts taken by plaintiff upon its payment of invoices within certain periods of time designated by the vendors of the material. Defendant urges that such treatment of purchase discounts is according to the best accounting practice, and that the Government should only have to refund to plaintiff net costs incurred in the purchase of inventory on hand.

Had the termination clause provided only for the refund of net costs incurred, then the deduction of any and all discounts taken by plaintiff would be proper. The termination clause, however, provides that a contractor is entitled to a proportionate profit on the uncompleted portion of its contract and thus the discounts allowed plaintiff on purchases consummated prior to termination represent credits which tend to increase plaintiff's profit in the exact amount of discounts taken. Whether these discounts are deducted from inventory values and added to allowable profits, or included in the inventory at invoiced values and not added to allowable profits, would not change the net amount to which plaintiff might be entitled. Plaintiff used the generally accepted accounting practice of including material at invoiced prices to establish its cost of sales, and to determine operating ratios for the distribution

of general administrative expense. There is no evidence in this case to justify changing this system. Plaintiff earned this discount prior to termination and it can either represent a saving on its material purchases, or be added in the same amount to its proportionate allowable operating profits. Discounts represent a saving which is ultimately reflected as an increase in net earnings and may be treated either as a savings in costs of materials, which would increase profits, or as a direct addition to net operating profits. Discounts on purchases alone do not represent true or actual earnings. But any savings, by discounts or otherwise, will increase profits on any fixed selling price unit in the exact amount of such savings. Plaintiff is entitled to the net cost of its purchases plus the discount taken on such purchases prior to termination in the sum of $100.10.

■ Salvage value of paint drums.— Plaintiff claims an additional allowance of $25.00 representing the salvage value of twenty paint drums on hand at the time of termination. In plaintiff's termination inventory there were 1,055½ gallons of paint costing $1.25 per gallon, and $6.00 each for the twenty drums in which the paint was contained. Empty drums had a salvage value of $1.25 each. The contracting officer determined that only ten of the drums of paint were needed to complete the uncompleted portion of the contract and that the cost of the ten excess drums of paint should be deducted from the value of the inventory on hand. In computing the total inventory costs, defendant erroneously deducted $25.00 which amount represents the full salvage value of the twenty drums. Plaintiff retained the ten drums of paint not allocable to the contract, costing $716.88, and defendant corrected its error by deducting only $691.88 from the value of plaintiff's inventory.

Plaintiff is not entitled to any additional allowance for the salvage value of the paint drums.

### Factory Burden

■ Factory burden, or factory overhead, represents expenses of production which are not identified with the product with sufficient certainty to warrant in-

cluding them as a part of the cost of the material or labor. Plaintiff's books carried these items of expense in separate accounts, entitled "Watchmen," "Building Repairs," "Rough Planning," etc. Plaintiff is entitled to an allowance for that part of its factory burden which is properly allocable to the uncompleted portion of its contract.

During the performance of the contract, plaintiff followed the usual practice of allocating factory overhead on the basis of direct labor. With respect to the uncompleted portion of its contract, plaintiff's books reveal no charge for direct labor. Accordingly, both plaintiff and defendant agreed that the method employed in plaintiff's books for distributing such overhead could not be used for determining the factory burden applicable to the uncompleted portion of the contract.

We have found, and the parties are agreed, that plaintiff's total direct costs of manufacturing, including direct labor and materials, for the contract performance period (February 1 to September 30, 1943) was $193,828.41. We have also found that plaintiff's total factory burden for that same period was $31,038.17. This figure does not include accounts representing contingent expenses, reserves or other indeterminate expenses,[3] but only actual and normal expenses which are not directly chargeable as direct costs. The ratio of such total factory burden or indirect costs, to the total direct costs, is 16.01 percent. In order to determine the amount of factory burden expenses incurred by plaintiff on the uncompleted portion of its contract, we have applied this percentage to the direct costs of materials which plaintiff had on hand when the contract was terminated, and which would have been required to complete the contract. Those direct costs, as found above, were $8,167.63. We thus find that the proper amount allowable as factory burden on the uncompleted portion of the contract, is $1,307.64.

Defendant contends that the ratio of 16.01 percent is too large a percentage of factory burden for the uncompleted portion of

plaintiff's contract because the physical inventory of direct costs of such uncompleted portion is represented on plaintiff's books only by materials purchased and with no charges for direct labor. In arriving at what it considered to be the proper percentage of factory burden, defendant used the same denominator or $193,828.41 representing total direct costs, but reduced the numerator, representing indirect costs or factory burden, by eliminating a number of accounts on the theory that the expenses in such accounts were incurred only in connection with direct labor. By reducing total indirect expenses from $31,038.17 to $13,511.75, defendant reached a percentage of 6.97 which it applied to $8,067.53 ($8,-167.63 less purchase discount of $100.10) and allowed only $562.31 for factory burden expenses incurred upon the uncompleted portion of plaintiff's contract.

We cannot agree with defendant's treatment of this allocation. Although no labor costs were charged against the uncompleted portion of the contract, a portion of the materials inventoried as on hand and required for completion of the contract, were actually in process of manufacture at the date of termination. The evidence as a whole does not sustain defendant's contention that the factory expense accounts eliminated bore no relation to plaintiff's termination inventory. Under the circumstances, the best method for distributing a fair and reasonable portion of the factory burden against the uncompleted portion of the contract is an allocation based on the ratio of total factory overhead to total direct costs. On this basis, the applicable factory burden would amount to 16.01 percent of $8,167.63, or $1,307.64.

### Unamortized Costs of Special Equipment

Defendant allowed plaintiff $47.74 for that portion of the unamortized cost of a rivet machine which is chargeable to the uncompleted portion of the contract. Both parties agree that this figure is correct.

Defendant also allowed $156.65 in connection with the unamortized cost of certain trucks and conveyors which plaintiff had constructed at the beginning of the

---

[3] Section 6(d) (*i*) of the Contract Settlement Act of 1944, 41 U.S.C.A. § 106

(d) (*i*), provides that such expenses shall not be included in termination claims.

contract. Plaintiff claims an additional allowance of $24.86 for overhead chargeable to the construction of this equipment. At the time the trucks and conveyors were constructed, no overhead was allocated against these units on plaintiff's books; any overhead incurred was allocated and absorbed in other manufacturing. The plaintiff had already allocated its factory burden to other manufacturing; therefore, the allowance of $24.86 claimed by plaintiff would represent a duplication.

### Administrative Expenses

Plaintiff is entitled to allowance for administrative expenses applicable to the uncompleted portion of its contract. Plaintiff claims $953.50 on this item, but defendant determined that only $175.41 was allowable.

General administrative expenses are usually and properly distributed against total manufacturing costs. The parties agreed that plaintiff's total manufacturing costs (including direct labor, materials, and factory burden) from February 1 to September 30, 1943, were $224,828.56. During the same period, plaintiff's total general administrative expense was $22,023.83 or 9.796 percent of its total manufacturing costs. With respect to the uncompleted portion of its contract, plaintiff's total manufacturing costs (including inventory, factory burden, and unamortized costs of equipment) were $9,679.66. A fair and reasonable apportionment of administrative expenses applicable to the uncompleted part of the contract is 9.796 percent of $9,679.66, or $948.22.

Defendant objects to this treatment of plaintiff's claim for several reasons. With respect to general administrative expenses which we have found to amount to $22,023.83, defendant contends that commissions paid to plaintiff's broker, totaling $2,251.35, should be eliminated on the ground that they represented payments on completed units and could therefore not be allocated to the uncompleted portion of the contract. If we eliminate the commissions paid on the completed units, commissions at the same rate would have to be deducted from the estimated cost of completing the uncompleted portion of plaintiff's contract

thereby increasing the total estimated profit thereon. This defendant does not do.

Included in the $22,023.83 of general administrative expenses is $4,314.79 representing bonuses paid to employees during the performance period of the contract (February 1 to September 30, 1943). Defendant contends that the bonuses paid should be adjusted on an annual basis and only eight-twelfths of such bonuses allocated to administrative expenses. No other factory burden or general expense was adjusted for the period beyond the termination date of the contract by either party. There is, therefore, no justification for the adjustment of bonuses beyond the performance period unless all other costs are computed on the same annual basis.

Finally, defendant contends that general administrative expenses should be distributed with respect to the uncompleted portion of the contract against factory burden and amortization costs only and not against material costs, because the extent of plaintiff's operations on the uncompleted portion of the contract was the purchase of materials only. Although plaintiff's termination inventory included no item of direct labor, the fair and reasonable allocation of general administrative expense is applicable to all determinable costs previously ascertained. Plaintiff is entitled to recover $948.22 on this claim.

### Profit

Plaintiff is entitled to an allowance for profit on the uncompleted part of the contract. Paragraph (d) (3) of Article 12 of the contract contains the following formula to be used in determining the amount to be allowed as profit:

(3) * * *

(d) * * * the Government * * * shall * * * compensate the Contract for the uncompleted portion of the contract as follows:

* * * * * *

(3) By paying the Contractor as a profit on the uncompleted portion of the contract insofar as a profit is realized hereunder, a sum to be computed by the Contracting Officer in the following manner:

(A) The Contracting Officer shall estimate the profit which would have been

realized on the uncompleted portion of the contract if the contract had been completed and labor and material costs prevailing at the date of termination had remained in effect.

(B) Estimate, from a consideration of all relevant factors, the percentage of completion of the uncompleted portion of the contract.

(C) Multiply the anticipated profit determined under (A) by the percentage determined under (B). The result is the amount to be paid to the Contractor as a proportional share of profit, if any, as above provided.

We have applied the above formula as follows:

As found in special finding of fact number 20, the contract price of the 4,973 lockers remaining uncompleted at the time of termination, was $22,875.80. The total estimated cost of completing those lockers was $18,398.36. The net estimated profit on these uncompleted lockers was thus $4,477.44. Paragraph B above, requires that we estimate the percentage of completion of the uncompleted portion of the contract. The costs already incurred on the uncompleted portion of the contract were $10,627.88 including cost of material, factory burden, unamortized costs of equipment, and administrative expenses. These same elements are included in the estimated cost of completing the lockers. The ratio of the costs already incurred on the uncompleted portion of the contract to the total estimated cost of completion is 57.77 percent and this figure, we believe, represents the percentage of completion of the uncompleted portion of the contract. Defendant insists that in computing costs already incurred on the uncompleted portion of the contract for the purposes of this formula, the amount expended for materials should be eliminated on the theory that no value had been added to such materials, most of them being unprocessed at the termination date of the contract. We think that defendant fails to take into consideration all the relevant factors. If we followed defendant's theory that plaintiff had done nothing toward the completion of the uncompleted portion of its contract but purchase materials, plaintiff might not be allowed anything by way of profit since factory burden and administrative expenses allocated to the uncompleted portion were based only on the materials inventory. Plaintiff did not process more of the material on hand because it was given 10 days in which to complete as much as possible of the processed parts then on hand. As a result on September 30, 1943, plaintiff had on hand only $510.34 worth of partially manufactured wooden parts and $348.89 worth of fibreboard covers. These parts were sold for the account of the contracting officer at $115, representing a loss of $744.23. The remaining unprocessed materials, excepting those taken over by the Government, were sold for the account of the contracting officer for $7,204.20 representing a profit to the defendant (as a part of the disposal credit) over costs allowed plaintiff, of $909.78. By not processing the materials on hand and selling them unprocessed, plaintiff reduced its manufacturing processes (and according to defendant, its percentage of completion of the uncompleted portion of the contract) during the 10 days prior to termination, to the advantage of the government. This fact should not operate to plaintiff's disadvantage in allowance of profit, which it would do if we eliminate the purchase of materials as a factor toward completion of the contract. Applying 57.77 as the percentage of completion to the anticipated profits in the amount of $4,477.44, we find $2,586.62 to be the proportionate share of profit to which plaintiff is entitled. Inasmuch as plaintiff only claims a profit of $2,520.25, we will allow that amount.

### Claim for plaintiff's accounting and legal fees

As part of its termination claim, plaintiff sues to recover for reasonable accounting and legal fees incurred in connection with its suit in this Court. Plaintiff contends that such fees are properly allowable under Section 6(d) of the Contract Settlement Act of 1944, 41 U.S.C.A. § 106(d). Defendant contends that the only accounting and legal fees which may be taken into account are those incident to the contract-

or's negotiations with the contracting agency in attempting to arrive at a settlement.

Section 6 of the Contract Settlement Act provides in part as follows:

"(b) Methods and standards: Each contracting agency shall establish methods and standards * * * for determining fair compensation for the termination of war contracts on the basis of actual, standard, average, or estimated costs * * *.

"(c) Any contracting agency may settle all or any part of any termination claim under any war contract by agreement with the war contractor, or by determination of the amount due on the claim or part thereof without such agreement * * *. Where any such settlement is made by determination without agreement, it shall * * * be final and conclusive * * * unless the war contractor appeals or brings suit in accordance with section 113 of this title * * *.

"(d) Except as hereinafter provided, the methods and standards established under subsection (b) of this section for determining fair compensation for termination claims which are not settled by agreement shall be designed to compensate the war contractor fairly for the termination of the war contract, taking into account

* * * * * * —

"(3) reasonable * * * legal * * * and other costs and expenses incident to termination and settlement of the terminated war contract; * * *.

"The following shall not be included as elements of cost:

"(i) * * * fees and other expenses in connection with * * * prosecution of * * * claims against the Government (except as provided in paragraph (3) above) * * *."

Section 13(b) of the Contract Settlement Act of 1944 provides that a war contractor aggrieved by the findings of a contracting agency may (1) appeal to the Appeal Board, or (2) bring suit against the United States in the Court of Claims. Section 13(c) (3) provides in part as follows:

"(3) Notwithstanding any contrary provision in any war contract, the Appeal Board or court shall not be bound by the findings of the contracting agency, but shall treat such findings as prima facie correct, and the burden shall be on the war contractor to establish that the amount due on his claim or part thereof exceeds the amount allowed by the findings of the contracting agency. * * * Unless the case is remanded, the Appeal Board or court shall enter the appropriate award or judgment on the basis of the law and facts, and may increase or decrease the amount allowed by the findings of the contracting agency."

Defendant tells us that Section 13(b) confers jurisdiction on this court merely to review the determination made by the contracting agency and to correct any errors found in that determination. Legal and accounting fees incurred in connection with a suit in this court could not have been considered during the termination proceedings in the contracting agency and would not therefore be a part of the claim and termination findings which the court is supposed to review. Section 6(d) is not, says defendant, a direction to this court or to the Appeal Board to allow such legal and accounting fees.

We have examined the regulations issued by the Director of Contract Settlement, and cases involving this question which have been decided by the Appeal Board. While we are not necessarily bound by the decisions of that Board, we think they may serve helpful as a guide in deciding this matter. Under the regulatory authority given in Section 4(b) of the Contract Settlement Act, 41 U.S.C.A. § 104(b), the Director of Contract Settlement has issued regulations setting forth overall policies of contract termination. These regulations include the rules of practice and procedure for the Appeal Board which has concurrent jurisdiction with this court over appeals from agency determinations.

Termination Cost Memorandum No. 11, issued under Regulation No. 14 of the Office of Contract Settlement, provides that settlement expenses shall not include accounting, legal, clerical, and other costs and expenses incurred by a contractor in any formal appeal or submission, either within a contracting agency or to the Appeal Board of the Office of Contract Settlement or suit in court where such pro-

ceeding is instituted for the purpose of obtaining payment in excess of the settlement amount determined to be due by the Government. In the Appeal of Electric Spray-it Company v. War Department, Proceeding No. 88, before the Appeal Board, decided April 28, 1947, the Board disallowed legal and accounting expenses incurred in prosecuting the appeal before the Board.

█ In view of the general rule that attorneys fees are not allowed in suits against the United States in the absence of an express statutory provision allowing them, we are disposed to agree with defendant's interpretation of the Contract Settlement Act. It is clear from the statute that the contracting agency must include any such fees incurred in connection with termination negotiations with it. It is not at all clear that section 6(d) applies to this court or to the Appeal Board with respect to any expenses arising after the final determination has been made by the terminating agency.

Defendant allowed plaintiff $290.79 for certain travel expenses and costs incurred in disposing of material on hand after the contract was terminated. Plaintiff is not entitled to any further allowance for post-termination expenses.

Interest.—On August 15, 1944, the contracting officer issued his written findings of fact in which he determined that the amount due plaintiff as a termination claim was $2,544.50. On August 31, 1944, defendant sent plaintiff a voucher for 90% of that amount, or $2,290.05. Plaintiff refused to accept the allowance made by the contracting officer and returned the voucher. Plaintiff contends that interest on the amount so tendered should continue to run to the date of actual payment if the amount is increased upon the appeal to this court. Section 6(f) of the Contract Settlement Act of 1944 provides for the payment of interest at the rate of 2½ percent per annum for the period beginning thirty days after the date fixed for termination and ending with the date of final payment. It further provides that interest shall not accrue after the thirtieth day following the delivery of the findings unless "such amount is increased upon such appeal or suit." Section 13, dealing with appeals to this court or to the Appeal Board, provides that within thirty days after the delivery of its findings, the contracting agency shall pay the war contractor at least 90 per centum of the amount determined to be due. Following this direction, the contracting officer sent plaintiff a voucher for 90 per centum of the amount he had determined was due plaintiff. Plaintiff tells us that he could not accept the voucher because it purported to represent 90 percent of the fixed amount to which it was entitled and the acceptance of it would have been equivalent to an agreement or an admission by plaintiff that defendant's determination represented all that was due under its termination claim.

█ We find no merit in plaintiff's contention. Plaintiff's right to appeal from the findings of the contracting agency is expressly reserved by Section 13(b) of the Contract Settlement Act. Plaintiff does not lose that right by accepting payment of the 90 percent of the award of the contracting agency from which he appeals, and payment of which the agency is directed to make. Nothing in Section 6(f), relied on by plaintiff, indicates that interest shall continue to accrue on that part of an award which has been paid. Plaintiff is entitled to the statutory rate of interest of 2½ percent on the amount hereinafter found to be due, from thirty days after termination until the date of receipt of the government voucher in payment of $2,290.05, and at the same rate on the difference between the judgment herein and $2,290.05, to the date of settlement.

Plaintiff is entitled to recover $6,119.71, with interest thereon at 2½ percent from October 30, 1943, to August 31, 1944, and interest on $3,829.66 at 2½ percent from August 31, 1944, to date of payment.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.