Mike **MIZOKAMI**, Sam **Mizokami**, Tom **Mizokami**, and **Hatsuyo Mizokami**

v.

The **UNITED STATES**.

No. 5–65.

United States Court of Claims.

July 16, 1969.

F. Trowbridge vom Baur, Washington, D. C., for plaintiffs, George M. Coburn and Geoffrey T. Keating, Washington, D. C., of counsel.

R. W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Chief Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on November 29, 1968. Exceptions to the commissioner's findings of fact and recommended conclusion of law were filed by the parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

The court is in agreement with the opinion, findings and recommended conclusion of law of the commissioner with certain changes and it incorporates and adopts the same, with changes and modifications, as hereinafter set forth, as the basis for its judgment in this case. Therefore, plaintiffs are entitled to recover and judgment is entered for plaintiffs in the sum of $301,974.33.

Chief Commissioner Bennett's opinion, as modified by the court, is as follows:

Plaintiffs, partners in Mizokami Brothers Produce, growers and shippers of fresh vegetables, are the largest growers of summer spinach in the Unit-

ed States. From their main location at Blanca, Colorado, plaintiffs ship most of their summer spinach crop to the eastern United States, where it is washed, graded, and made up in 10- and 20-ounce packages ready for household use by firms in the prepackaged vegetable industry.

Between July 16 and August 17, 1962, agents of the Food and Drug Administration (FDA) took samples from 10 cars of spinach shipped by plaintiffs to various customers to check for possible violations of the Federal Food, Drug, and Cosmetic Act. 21 U.S.C. § 301 et seq. As to eight of the cars, plaintiffs were advised that no unallowable pesticide contamination had been found. By means of paper chromatographic testing, however, FDA determined that two shipments to Muller Foods Company of Jersey City, New Jersey, were contaminated with heptachlor, a pesticide for which FDA regulations allowed no human tolerance on spinach. The samples had been taken on August 6, 1962, and, on August 10, 1962, FDA notified Muller of its findings and directed that no further use be made of the spinach. On the same date, FDA secured an embargo on the remaining spinach by the Jersey City Board of Health. One of the two cars had already been unloaded, while the other still contained 418 bushels of spinach. On August 14, 1962, defendant filed a libel of seizure and condemnation against the 418 bushels of spinach in the United States District Court for New Jersey on grounds that it was contaminated or adulterated within the meaning of 21 U.S.C. §§ 342(a) (2) (B) and 346a(a). Under date of August 17, 1962, FDA officially notified plaintiffs of the heptachlor finding.

Plaintiffs took numerous steps to check the accuracy of the FDA finding and to investigate potential sources of contamination after hearing of the finding from the Muller Foods Company on August 10, 1962. Plaintiffs retained William R. Bradley and Associates, chemists, of Newark, New Jersey, and Dr. Polen of the Velsicol Corporation of Chicago and the inventor of heptachlor, to test samples of the condemned spinach. Tests by both proved negative as to the presence of heptachlor. On August 30, 1962, plaintiff Mike Mizokami and counsel appeared at an FDA hearing in Denver, denying ever having used heptachlor, and presenting results of their fruitless search for a source of contamination.

At this juncture, the FDA sent a sample of the condemned spinach to Washington for analysis by gas chromatography, a procedure considerably more sensitive than paper chromatography. By letter of September 24, 1962, the Deputy Commissioner of FDA admitted to plaintiffs that the original analysis by paper chromatography was in error and that the gas chromatographic analysis had not confirmed the presence of heptachlor.

Plaintiffs now claim damages resulting from FDA action in the amount of $543,879.96, stemming from four main alleged sources as follows: (1) discing under spinach forced by defendant's error, $438,593.75; (2) sales of spinach at lower prices in the 1962 and early 1963 summer spinach seasons, $75,633.76; (3) cost of Colorado counsel, $6,651.35; (4) miscellaneous travel, telephone, legal, and other expenses, $23,001.10.

I

Plaintiffs are before the court under Priv.L. No. 88–346, 78 Stat. 1195 (1964), which provides as follows:

* * * That jurisdiction is hereby conferred on the United States Court of Claims to hear, determine, and render judgment on the claims of Mike Mizokami, Sam Mizokami, Tom Mizokami, and Hatsuyo Mizokami, jointly, doing business as Mizokami Brothers Produce, of Blanca, Colorado, based upon damages and losses allegedly sustained as the result of erroneous determinations by the Food and Drug Administration in 1962 that spinach, grown by the said Mike Mizokami, Sam Mizokami, Tom Mizokami, and Hatsuyo Mizokami, jointly, doing

business as Mizokami Brothers Produce, of Blanca, Colorado, was contaminated by the pesticide heptachlor. Suit upon such claims may be instituted any time within one year of the date of approval of this Act.

Past special jurisdictional acts can be placed in one of two general categories. One type of act is designed merely to waive some affirmative defense which the United States could presumably otherwise effectively plead. Such acts have waived defenses based on statutes of limitations,[1] as well as those based on the principle of res judicata.[2]

The other type of act additionally embraces an admission of liability by the United States and leaves a greater or lesser number of the factual and legal questions relating to damages for the court. Pope v. United States, 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3 (1944); Indians of Cal. v. United States, 98 Ct.Cl. 583 (1942), *cert. denied,* 319 U.S. 764, 63 S.Ct. 1324, 87 L.Ed. 1714 (1943). *See generally,* Glidden Co. v. Zdanok, 370 U.S. 530, 566–567, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

It is clear that Priv.L.No. 88–346, *supra,* constitutes a waiver of the sovereign immunity which defendant could otherwise claim in this case. In the absence of the special act, any suit on the above-stated facts under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., would be precluded by 28 U.S.C. § 2680(h), which expressly excepts from the Tort Claims Act waiver of sovereign immunity "[a]ny claim arising out of * * * misrepresentation * * *." In

Jones v. United States, 207 F.2d 563 (2d Cir.1953), *cert. denied,* 347 U.S. 921, 74 S.Ct. 518, 98 L.Ed. 1075 (1954), plaintiffs sought damages for an alleged misrepresentation by the Director of the United States Geological Survey as to the oil production potential of certain realty which the United States had leased to a corporation in which plaintiffs were substantial stockholders. Though USGS had sufficient information available to compute accurately the productive capacity of the land, the Director supplied plaintiffs with a much lower figure than was ultimately recovered, thereby inducing them to sell their stock at an insufficient price. Plaintiffs' complaint was based on theories of both negligent and willful misrepresentation. Dismissal was affirmed by Judge Frank in these words:

> Plaintiffs' second cause of action asserts wilful misrepresentation. This claim is clearly barred by Sec. 2680(h) of the [Tort Claims] Act. * * * We think the first cause of action, for negligence, is also barred. Section 2680(h) prohibits suits against the government on claims arising out of "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." As "deceit" means fraudulent misrepresentation, "misrepresentation" must have been meant to include negligent misrepresentation, since otherwise the word "misrepresentation" would be duplicative. [207 F.2d at 564.]

1. United States v. Central Eureka Mining Co., 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed. 2d 1228 (1958); United States v. Alcea Band of Tillamooks, 329 U.S. 40, 67 S.Ct. 167, 91 L.Ed. 29 (1946); Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 65 S.Ct. 690, 89 L. Ed. 985 (1945); Erwin v. United States, 97 U.S. 392, 24 L.Ed. 1065 (1878); Aragona Constr. Co. v. United States, 165 Ct. Cl. 382 (1964); Hempstead Warehouse Corp. v. United States, 98 F.Supp. 572, 120 Ct.Cl. 291 (1951); Coos Bay Lower Umpqua & Siuslaw Indian Tribes v.

United States, 87 Ct.Cl. 143 (1938), *cert. denied,* 306 U.S. 653, 59 S.Ct. 642, 83 L. Ed. 1052 (1939); Duwamish, etc., Indians v. United States, 79 Ct.Cl. 530 (1934), *cert. denied,* 295 U.S. 755, 55 S. Ct. 913, 79 L.Ed. 1698 (1935); Assiniboine Indian Tribe v. United States, 77 Ct.Cl. 347 (1933), *appeal dismissed, cert. denied,* 292 U.S. 606, 54 S.Ct. 772, 78 L. Ed. 1467 (1934).

2. Cherokee Nation v. United States, 270 U.S. 476, 46 S.Ct. 428, 70 L.Ed. 694 (1926).

Defendant's motion to dismiss for failure to state a claim was likewise granted in Anglo-American & Overseas Corp. v. United States, 242 F.2d 236 (2d Cir.1957), aff'g 144 F.Supp. 635 (S.D. N.Y.1956). At issue there was an alleged misrepresentation by the FDA that certain tomato paste imported by plaintiffs complied with standards of the Pure Food and Drug Act. The court held that the claim

> * * * "arose out of" the assertedly negligent representation of the quality of the tomato paste by federal employees. Such a claim is barred by Jones v. United States, 2 Cir., 207 F.2d 563, certiorari denied 347 U.S. 921, 74 S.Ct. 518, 98 L.Ed. 1075, which held that Section 2680(h) * * * excepted from liability negligent as well as intentional misrepresentation. [242 F.2d at 237.]

The Tenth Circuit adopted a similar position, granting summary judgment for defendant in Hall v. United States, 274 F.2d 69, 71 (10th Cir.1959), because

> * * * [p]laintiff's loss came about when the Government agents misrepresented the condition of the cattle, telling him they were diseased when, in fact, they were free from disease. The claim is that this misrepresentation caused plaintiff to sell his cattle at a loss. * * * Misrepresentation as used in the exclusionary provision of the * * * [Tort Claims Act] was meant to include negligent misrepresentation.

The Supreme Court, in reversing a Fourth Circuit holding that the United States was liable to a home purchaser who was the victim of a negligently made appraisal by the Federal Housing Administration, settled the negligent misrepresentation question in favor of the Government, citing the *Jones, Anglo-American & Overseas Corp.*, and *Hall* cases, *supra*. United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1961). The Supreme Court in *Neustadt* noted that it could not accept the lower court's reasoning that the misrepresentation involved was

merely "incidental" to the plaintiff's claim. The Court then held that it was

> * * * in accord with the view urged by the Government, and unanimously adopted by all Circuits which have previously had occasion to pass on the question, that § 2680(h) comprehends claims arising out of negligent, as well as willful, misrepresentation. [366 U.S. at 702, 81 S.Ct. at 1298.]

The Court of Claims has recently denied, because of 28 U.S.C. § 2680(h), any recovery on the legal claim in a congressional reference case based on negligent misrepresentation by an Agriculture Department official that certain potatoes would meet the import requirements of Sweden, O'Donnell v. United States, 166 Ct.Cl. 107, 109 (1964).

The legislative history of the special jurisdictional act now before the court indicates that Congress was well aware of the Tort Claims Act bar against plaintiffs. The House and Senate Judiciary Committees each said:

> The committee feels that the Government's admission of error and expression of regret for the incident is a commendable act. However, as is apparent in this appeal for legislative relief, the Mizokami Bros. have *no other way to be compensated* for any damages or losses caused by the Government's erroneous action but to appeal to Congress. [H.R.Rep. No. 1659, 88th Cong., 2d Sess. 3 (1964); S.Rep. No. 1578, 88th Cong., 2d Sess. 3 (1964) (emphasis added).]

The committee report in each House also sets out letters from the Departments of Justice and Health, Education, and Welfare which cite the Tort Claims Act doctrine discussed above and recommend denial of relief to plaintiffs. H. R.Rep. No. 1659, *supra* at 4–7; S.Rep. No. 1578, *supra* at 5–8.

It thus seems certain that the sovereign immunity bar was lifted by the provision that "jurisdiction is hereby conferred" on this court to "hear, determine, and render judgment" on plain-

tiffs' claims. Priv.L.No. 88–346, *supra.* To hold otherwise would be to presume that Congress passed the bill in question merely to send plaintiffs to this forum for a ritual confirmation of the *Neustadt* rule and concomitant dismissal of their petition.

It is concluded, however, that Congress has gone one step further and conceded liability for the actions of the FDA. The committee report in each House contains the following crucial wording:

> The persons affected have appealed to the Congress for relief because the Government did not finally correct its erroneous determination until a considerable period of time had elapsed and as a result the growers suffered losses and difficulties in connection with their business.

> \*    \*    \*    \*    \*    \*

> \* \* \* The committee finds that it must disagree with the conclusion of the Department of Health, Education, and Welfare that relief should not be extended in this case. \* \* \*

> It is not enough to say that a mistake by the Government should be borne by the individual harmed in the absence of general legislation. \* \* \* The Congress has the power to grant relief and it seems only right that a remedy should be provided. However, this committee feels that questions concerning the quantum of damages and whether a sufficient connection can be proven between the Government's action and the alleged losses are most properly determined by a court. Under a jurisdictional bill, these matters must be proven by competent evidence in accordance with the rules and procedures of the Court of Claims. [H.R.Rep. No. 1659, *supra* at 2, 4; S.Rep. No. 1578, *supra* at 4–5 (emphasis added).]

Though perhaps it could more clearly have so provided, it thus appears that Congress has left the factual and legal questions relating to causation and damages, matters especially appropriate for judicial determination, for this court, having first determined liability itself. It has exercised its power to provide for the payment of debts [3] and has imposed on the Government "a new obligation where there has been none before" by recognizing a claim "merely moral or honorary." Pope v. United States, *supra* 323 U.S. at 9, 65 S.Ct. at 21; *see* United States v. Realty Co., 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215 (1896).

Defendant cites Aragona Constr. Co. v. United States and Hempstead Warehouse Corp. v. United States, *supra,* in opposition to this viewpoint. In the former case, however, the jurisdictional bill contained the following provision:

> \* \* \* Proceedings for the determination of such claim and review thereof, and payment of any judgment thereon, shall be had as in the case of claims over which such court has jurisdiction under section 1491 of title 28 of the United States Code.

> \* \* \* Nothing contained in this Act shall be construed as an inference of liability on the part of the United States Government. [165 Ct.Cl. at 393.]

The jurisdictional bill in the *Hempstead Warehouse Corp.* case likewise provided that

> \* \* \* [p]roceedings for the determination of such claim, and appeals from, and payment of, any judgment thereon shall be in the same manner as in the case of claims over which the Court of Claims has jurisdiction under section 145 of the Judicial Code, as amended. [98 F.Supp. 572, 120 Ct.Cl. at 292.]

No reference to the general jurisdictional act of this court or to any other gen-

---

3. U.S.Const. art. I, § 8. If Congress had not intended to admit liability, it could, and doubtless would, have referred the bill pursuant to the congressional reference procedures, 28 U.S.C. §§ 1492, 2509, for advice on the equitable right, if any, of plaintiffs to recover.

1380

eral jurisdictional act is made in Priv. L.No. 88–346, *supra*. The two cases cited by defendant, therefore, are inapposite to the instant one.

## II

■ It is agreed that plaintiffs disced under 335 acres of quality spinach in the latter part of the 1962 season and that they obtained lower average prices for their 1962 and early 1963 crops than for those in 1961 and early 1962, respectively. It is as to the cause of that situation that the parties differ, plaintiffs ascribing it to the FDA and defendant blaming an allegedly weak market for summer spinach.

Defendant claims that a 37-percent drop over the 1959–65 period in combined rail and truck unloads of fresh spinach in the New York, Philadelphia, and Boston markets (where six of plaintiffs' seven major customers are located) demonstrates an overall weakness in the fresh spinach market due to competition from frozen spinach. It is doubtful that this one statistic establishes such a broad conclusion. In addition, plaintiffs' spinach is shown to be of such high quality that it actually does not compete with most other varieties. This fact seriously weakens that portion of defendant's evidence which is based on the market for spinach in general.

Plaintiffs have also proved that from 1957–65, except for 1962 (after July 16) and early 1963, the demand for Mizokami spinach far exceeded the supply, necessitating a procedure whereby plaintiffs' eastern broker would prorate cars among customers, filling but a given percentage of each order to prevent one customer from gaining a competitive advantage. Even assuming, *arguendo*, that the general fresh spinach market has declined, such hypothetical decline appears not to have affected plaintiffs in the years just before and after those in question and, by reasonable inference, not in 1962 and early 1963.

Defendant has based considerable argument on price figures for the New York wholesale market, though testimony of defendant's principal witness shows that such figures include transportation costs, profit for the wholesaler, and possibly other items. Since the prices relevant to this case are those for which plaintiffs sell spinach *f. o. b.* Blanca, Colorado, even if any conclusions significantly favorable to defendant could be drawn from the New York figures, which conclusions are not shown, they would be of indirect analogical value at best.

A marketing and acreage guide issued by the Agricultural Marketing Service of the Department of Agriculture in February 1962 noted that the 1961 eastern spinach crop suffered heat damage during the fall harvest, thereby aiding the Colorado growers; it went on to suggest a planting increase for 1962 in Colorado spinach of 5 percent over 1961. Defendant points to the fact that combined rail and truck unloads of fresh spinach from all areas in the New York, Philadelphia, and Boston markets increased about 7 percent from the summer spinach season (June–October) of 1961 to that of 1962 to prove that Colorado growers ignored the AMS guide and overplanted, thereby glutting the market. It likewise seems doubtful that an increase in unloads from *all areas* in only *three cities* can be deemed to demonstrate a substantial overplanting in Colorado. Alternatively, one could argue from defendant's reasoning about the 37-percent drop in unloads, 1959–65, *supra*, that the 7-percent increase indicates a good market for summer spinach. Defendant would have it so that an increase in an unload figure shows an overplanting, while a decrease shows a weak market.

Plaintiffs, on the other hand, deal more specifically with the product in issue, relying on their proof of exceptional quality and inability to meet demand. Plaintiffs also produce expert testimony that their increase of 260 acres between 1961 and 1962 would not have hurt their market. Proof is adduced to *indicate*

that the demand in early 1962 of *plaintiffs'* customers, specifically, was strong.

Against this, defendant establishes that George Russ, of Center, Colorado, shipped some 57,224 bushels of spinach in 1962, in a 1-year project, and that he obtained prices near those received by plaintiffs. His entry into the market is suggested as a cause of the discing under and sales losses.

Although neither Daniel J. Storey, a Philadelphia customer then buying spinach through Hyman Rubin, nor Earlis R. Mead, market reporter for the Consumer Marketing Service of the Department of Agriculture in New York City, was contemporaneously aware of Mizokamis' FDA problems in 1962, plaintiffs establish that news travels fast in the produce business and that the overall effect of the stoppages and erroneous determination was to depress their business and force price cuts. Ernest La-Barba, of Dallas, Texas, started buying from competitors after FDA stoppage of a shipment to him on July 16, 1962, and resumed business with plaintiffs only because of dissatisfaction with other spinach. Community Produce of Boston, one of plaintiffs' seven major customers, bought no spinach from plaintiffs between August 4 and August 27, 1962, having had cars from Mizokami intercepted on August 2 and August 6, 1962. Hyman Rubin, plaintiffs' eastern broker, estimates that the FDA problem prevented his handling at least an additional 55 cars (46,200 bushels) of Mizokami spinach in 1962.

In sum, plaintiffs demonstrate a sufficient connection between the actions of defendant and their discing under and sales losses. Because, then, plaintiffs would have been able to sell their entire 1962 crop at substantial prices but for the FDA problem, the facts that 1962 sales to plaintiffs' seven major customers dropped only 8 percent from 1961, that plaintiffs sold more spinach between August 20 and September 24 in 1962 than in 1961 or 1963, and that plaintiffs' prices rose moderately in the latter part of the 1962 season, are of lit-

tle avail to defendant. For example, because of the acreage increase in 1962, plaintiffs should have sold *considerably* more spinach to their seven major customers and should have sold *considerably* more during the August 20–September 24 period for 1962 than for 1961 or 1963. Additionally, the mere fact that a moderate price increase occurred does not change the more crucial facts that prices were, for the duration of the August 10–September 24 period, lower in 1962 than in previous years and that the normal price increase expected in late August each year was smaller than usual in 1962. The proof adduced by defendant, therefore, fails to dispute the conclusions warranted by plaintiffs' evidence.

Having determined that "sufficient connection [has been] proven between the Government's action and the alleged losses," it remains for this court to ascertain "the quantum of damages." H.R.Rep. No. 1659, *supra* at 4; S.Rep. No. 1578, *supra* at 4. Such damages are recoverable only to the extent that they were "sustained as the result of erroneous determinations by the FDA. Priv.L.No. 88–346, *supra.* The first of such determinations having been made on August 10, 1962, plaintiffs' damages prior to that date (*i. e.,* from the date of the first FDA sampling on July 16) are not recoverable under the jurisdictional Act.

In Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), the Supreme Court explained that

> \* \* \* there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.

The Court of Claims has followed this general rule of damages, noting that it "is a settled principle that where the fact of damage has been established, absolute certainty or precise mathematical accuracy as to the amount of damages is not necessary." Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 729 (1964), and cases cited therein; *accord,* Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 174 Ct.Cl. 153, 184 (1966), and cases cited therein; Adams v. United States, 358 F.2d 986, 993, 175 Ct.Cl. 288, 299 (1966); Luria Bros. & Co. v. United States, 369 F.2d 701, 712–713 (1966), 177 Ct.Cl. 676, 695–696 (1966).

It is accordingly concluded that, absent the actions of the FDA in 1962, plaintiffs could have sold the crop on the 335 acreas which were eventually disced under, or about 134,556 additional bushels of spinach. It is further concluded that plaintiffs could have obtained an average price of $2.22 per bushel for their entire crop in 1962, such price being the overall average price received both in 1961 and 1963, so that, allowing for harvesting costs of $0.53 per bushel, an additional $227,399.64 would have been realized from the acreage not sold at all, as well as an additional $49,904.65 from the acreage sold at depressed prices, from August 10, 1962, through the end of the 1962 season, for an average of $1.83 per bushel. Finally, but for the last vestiges of the heptachlor problem, plaintiffs would have received about $2.07 per bushel for the first 25,-320 bushels sold in 1963 rather than the actual figure of $1.89 per bushel, thereby increasing their revenue $4,557.60.

All 165 hours of office time and all 31 days of travel time expended by plaintiffs' Colorado counsel, Mr. Whitford W. Myers, were related very closely to the heptachlor finding, in that they concerned the possibility of a Tort Claims Act action, reestablishing satisfactory relations with eastern customers, and preparation and prosecution of plaintiffs' endeavor to obtain legislative relief, culminating in the act under which this suit is brought. With regard to plaintiffs' claim for recovery of those expenses, defendant does not challenge the amount of time expended or the valuation placed thereon, but argues that plaintiffs should recover only for those services rendered prior to September 24, 1962, the date of FDA's letter of apology, citing Piggly Wiggly Corp. v. United States, 81 F.Supp. 819, 112 Ct.Cl. 391, (1949).[4] By its argument, defendant appears to agree with plaintiffs that the special jurisdictional act contemplates recovery of such fees, but urges that they must be limited, as aforesaid, to make the recovery on this item only $1,125.

There is no basis in logic or in the legislative history to choose the date of the FDA letter of apology to bar further recovery of Colorado counsel expenses, as all of Mr. Myers' work was equally related to defendant's error and plaintiffs' efforts to minimize its effects and ultimately to be made whole for them. It is also worthy of note that the services for which recovery is sought were all rendered prior to enactment of the jurisdictional act on October 6, 1964, and, therefore, not directly involved in the preparation and presentation of this lawsuit. Plaintiffs are entitled to recover $7,301.35,[5] representing 165 hours of office time at $15 per hour, 31 days of travel time at $150 per day, and $176.35 in reimbursement of expenses.

---

4. The court there referred to "the general rule that attorneys fees are not allowed in suits against the United States in the absence of an express statutory provision allowing them * * *." [81 F.Supp. at 829, 112 Ct.Cl. at 432.] This was a termination claim arising under the Contract Settlement Act which did not provide for attorneys' fees. *See also* Rash v. United States, 360 F.2d 940, 947, 175 Ct.Cl. 797, 810–811 (1966).

5. Plaintiffs paid Mr. Myers $650 and seek $6,651.35 in their claim for Colorado counsel expense. The larger sum allowed includes the $650 and accordingly deletes it from plaintiffs' claim for miscellaneous expense to avoid duplication and for uniformity.

Defendant does not challenge plaintiffs' recovery of the following items: (1) $1,591.30 for the value of the condemned spinach and storage, icing, and other expenses incident thereto; (2) $146.18 for expenses of the FDA hearing in Denver on August 30, 1962; (3) $185 for analysis of a sample of the condemned spinach by William R. Bradley and Associates, chemists, of Newark, New Jersey; (4) $315.60 for telephone expense of calls to counsel, customers, and chemists and other matters related to the FDA error through June 1963; and (5) $861 for legal expense in defense of the New Jersey libel suit.

Plaintiffs claim an additional $221.36 for telephone expense incurred due to the heptachlor problem for the period July 1963–June 1964. No reason appears to accept June 1963 as an arbitrary cutoff date for recovery of plaintiffs' telephone expense, all of which is equally related to defendant's actions and all of which was incurred before the jurisdictional act became law.

There is a failure of proof with regard to plaintiffs' claim for $1,507.50 direct labor expense of discing under the 335 acres in 1962.

Although Hyman Rubin sustained a loss of $5,437.06 in July and August 1962 on Mizokami spinach which he was unable to sell because of the FDA situation, the evidence fails to establish any preexisting obligation of the Mizokamis to reimburse Rubin for any of their spinach which for some reason he could not sell. Absent such proof, the sum claimed is not a loss sustained by plaintiffs and is therefore not susceptible of recovery under the terms of Priv.L.No. 88–346, *supra.*

Finally, plaintiffs are entitled to recover the travel expense (beyond Mike Mizokami's normal one annual business visit to eastern customers) necessitated by defendant's error through the date of passage of the jurisdictional act which commenced the judicial phase of their quest for relief. Such expense emanated from consultations with counsel, with FDA, with Congress, and with plaintiffs' eastern customers and amounts to $9,490.65.

In summary, it is concluded that Priv.L.No. 88–346, *supra,* is a special jurisdictional act which also concedes liability for actions of the FDA. Compensable damages sustained by plaintiffs include $227,399.64 for spinach disced under, $49,904.65 for sales of spinach at reduced prices (subsequent to August 10) in the 1962 season, and $4,557.60 for sales at reduced prices in the early 1963 season. Plaintiffs additionally are entitled to recover $7,301.35 for Colorado counsel expenses and $12,811.09 for miscellaneous travel, telephone, legal, and other expenses, all of which were directly related to the FDA actions.