LANCE INDUSTRIES, INC., Claimant,

v.

The UNITED STATES, Defendant.

Congressional Reference No. 2–78.

United States Claims Court.

Nov. 10, 1983.

Carol Connor, Columbia, S.C., for claimant. Timothy G. Quinn, Ellison, Quinn & Connor, Columbia, S.C., of counsel.

Timothy F. Noelker, Washington, D.C., with whom were Asst. Attys. Gen. J. Paul McGrath and Margaret C. McCloskey, Washington, D.C., for defendant.

## REPORT

NETTESHEIM, Hearing Officer:

On October 12, 1978, by S.Res. 545, 95th Cong., 2d Sess. (1978), the Senate referred S. 3451, 95th Cong., 2d Sess. (1978), to the Chief Commissioner of the United States Court of Claims. S. 3451, entitled "A Bill for the Relief of Lance Industries, Incorporated," proposes that the Secretary pay claimant Lance Industries, Inc. ("claimant"), out of any money in the Treasury not otherwise appropriated,

> [t]he sum of $ [blank] in full settlement of its claims against the United States for damages suffered by it as the direct and proximate result of the negligent transmission and publication of false information concerning the company's principal product, a self-defense chemical compound named "Lance", by various Federal agencies between September 16, 1977, and February 2, 1978.[1]

S.Res. 545 resolved that "S.3451 . . . together with all accompanying papers, is hereby referred to the Chief Commissioner of the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code, for further proceedings in accordance with applicable law."

Claimant's petition was filed with the Clerk of the Court of Claims on March 7, 1979, and defendant's answer was filed on June 5, 1979. Thorough discovery ensued between the parties, and an extensive stipulation of facts was reached. Trial was held on May 9–11, 1983; the post-trial briefing was completed on September 15, 1983.

The hearing officer has drawn upon the parties' factual stipulation, but, due to some disharmony between the stipulation and evidence of record, an independent assessment of the facts has been made. Departure from the stipulation also reflects the hearing officer's determination of the credibility and demeanor of the witnesses and re-evaluation of those parts of the stipulation that are not supported by documentary evidence. On the basis of the facts established by the evidence, as set forth in this report, it is concluded, and the Senate should be so informed: 1) that claimant was not wronged, because defendant was not negligent; 2) and that therefore no legal or equitable basis to allow recovery exists.

## FACTS

### BACKGROUND

This congressional reference case arises out of a widely publicized rumor which circulated through federal and state agencies in the latter part of 1976 and early 1977. According to the rumor, a substance known as "Lance" had been introduced into the drug culture and might be encountered by officers engaging in drug investigations. "Lance" was alleged to be a cocaine- or heroin-like substance. Sniffing or simple aerial exposure to the substance, in its most virulent form, reportedly would cause brain damage and tasting would cause instant death. Another version of the rumor warned that "Lance" was being mailed to federal government offices where employees would suffer the same consequences. The debilitating substance proved to be "CS,"[2] an irritating, but non-lethal, non-injurious form of tear gas.

The rumor merely would have sounded a false alarm, save that there then existed a

---

1. Typographical error evidently resulted in an incorrect statement of the dates. The correct dates are September 16, 1976, and February 2, 1977.

2. The common name of ortho-chlorobenzalmalononitrile is "CS."

commercial trademark product Lance with which the warning was identified by the public. Commercial Lance was similar to the product Mace, both containing a solution of CS sold in hand-held aerosol cylinders and used as self-protective devices. For ease of reference, the commercial product is referred to herein as Lance, while the street drug is designated as "Lance." Although commercial Lance is undisputedly a safe product, the negative publicity associated with "Lance," generated by the rumor, allegedly destroyed the expanding market for commercial Lance. Claimant's position is that the United States, although acting without malice, breached its duty of care to claimant by its failure to verify the rumor before republishing it throughout the federal government.

Commercial Lance's demise due to the "Lance" rumor comprises several episodes. The safety and the ingredients of the commercial product must be discussed, as well as the actual or reported incidents of abuse of the CS compound and the identification of commercial Lance with the reports of abuse. Next treated is the chain of dissemination through the state and federal agencies. Finally, the attempts to verify the reports before republication and the retractions of the warning are set out.

To summarize the critical events, the "Lance" rumor began with confusion over the identification of a substance seized by Alaska State Troopers in September 1976. A report embodying this confusion passed to the National Park Service (the "NPS"), which, in turn, passed it to the Organized Crime Task Force in Killeen, Texas, where it was reinforced by a separate report from the Temple, Texas Police Department. From Texas the rumor passed through United States Army Criminal Investigation Division Command (the "Army CID") channels to the United States Customs Service. "Customs" put the rumor on the national wire, where it was picked up by a multitude of agencies, including embassies overseas. At this point, reached only a few days after the Army CID's receipt of the initial report, twists appeared in the rumor. When it became apparent that commercial Lance or

CS was not capable of the deadly effects attributed to "Lance," retractions were issued. By that time, however, the news media had begun to report rumors throughout the country, and the failure of claimant's business followed.

## 1. *The Product*

Claimant presented a 1967 report on CS from the Department of the Army, Edgewood Arsenal. This report reveals that CS is not a gas, but is a "white, crystalline powder, similar in appearance to talcum powder." For use as a tear gas, CS must be dispensed into the air. The immediate effects caused by CS are a burning sensation in the eyes, tearing, coughing, and tightness in the chest. The effects last for five to ten minutes after exposure, during which time subjects are incapacitated.

Long before the events giving rise to this reference, the safety of CS had been well documented. Mice, rats, guinea pigs, rabbits, dogs, and monkeys were tested. The results showed that 2,600 times as much CS as is required to affect a man would constitute a fatal dose. The effective dose was rated as 10 to 20 milligrams per cubic meter. The Edgewood Report notes that CS had "never been implicated in any death in man despite repeated use." In fact, if data collected from more resistant species, such as swine, goats, sheep, and burros were included, the level necessary to reach lethal effects would be 15,000 times the effective dose.

Lance was an aerosol product. Each can contained one and one-fourth ounces material, consisting of one percent CS, acetate solvent, freon, and carbon dioxide as the propellant. Claimant in 1972 had a series of tests conducted by Leberco Laboratories, which concluded that Lance was a substance non-toxic by inhalation as defined in the Federal Hazardous Substances Act, 15 U.S.C. § 1261–1276 (1976). Leberco did not find Lance to be a skin or eye irritant under that law. Claimant also obtained an opinion from the American Humane Association

in 1975 that its product was not sufficiently irritating to be inhumane to dogs.

In sum, the record is clear, and the parties do not dispute, that Lance and its active ingredient CS constitute a safe, non-lethal, non-injuring irritating product.

### 2. The Rumor-Provoking Incidents

No direct evidence was presented that the rumor-provoking incidents actually occurred. Two major incidents, not supported by testimony or witness reports, originally provoked the rumor.

### a. The Alaska Incident

The first incident occurred in Alaska. Information was received by the Alaska State Patrol, which led on August 27, 1976, to the confiscation of a substance in a plastic bag from an 18-year old Anchorage male. Upon opening the bag, those persons in the room suffered irritating sensations. This bag was sent to a private laboratory in Anchorage where a chemist, Bernard Schecter, performed a test for case No. C76–16801 on September 9, 1976. The parties agree that Schecter's report, which is not in evidence, stated that the substance in the bag was of the same chemical group as Mace or Lance, *i.e.*, of the CS group. A copy of the report was sent to the Anchorage City Police on September 9, 1976, and also was received by the Alaska State Patrol.

The Schecter report was incorporated into Alaska State Troopers' Criminal Investigation Bureau ("CIB") Bulletin No. 101 (the "Alaska CIB Bulletin"), dated September 16, 1976. The Bulletin's warning listed three, not one, separate contacts with the substance, although only the incident involving the 18-year old male is described in any of the other evidence before the hearing officer. This Alaska CIB Bulletin became a nodal point in the dissemination of the "Lance" rumor.

### b. The Temple, Texas Incident

On September 15, 1976, police in Temple, Texas, received two unidentified, anonymous reports that a woman had suffered injury as a result of contact with a substance she thought was cocaine. The reports stated that upon hospitalization the woman was "mentally impaired." After checking with the local hospitals, police were unable to confirm that anyone fitting the description had actually been admitted to a hospital or been examined medically. The same night these reports were received, an unidentified male brought to the Temple Police Station "a small, foil-wrapped package which he believed was involved in the incident in which the female was allegedly hospitalized." The packaging of the substance was "similar to the packets used to wrap cocaine and heroin into individual hits." According to the statement of Leonard M. Hancock, Chief of Police in Temple, the department took no action.

After the "Lance" rumor had circulated in the federal government, inquiries reached Hancock concerning the Texas incidents. In late January or early February 1977, the Temple Police sent the substance that had been received in September to officials of the Drug Enforcement Administration (the "DEA") in Dallas, Texas, for analysis. The substance was identified as "100 percent, CS." According to Hancock, the DEA's report, which itself is not in evidence, stated that the substance, yellow in color, would cause critical injury or death if taken in the nose or mouth. The substance was not Lance.

### c. The Postal Service Incident

While the rumor spread through the federal and state government communications network, a new twist to the story was added by the United States Postal Service (the "USPS"). The source of the variation on the rumor was not explained in any testimony, but the variation first appeared in a telex from William E. Finn of USPS in Rochester, New York, to L.E. Rigsbee, General Manager, Logistics Division, Eastern Region, USPS in Philadelphia, Pennsylvania. According to stipulation, the same message was sent by Finn to Francis X. Biglin, Postmaster General, Eastern Region, USPS, although the document itself does not appear in the exhibits. Biglin was

author of "USPS Telex 025," which served as the nodal point for this part of the rumor. Finn's telex to Rigsbee is dated February 1, 1977, at 1545 EST, while the USPS Telex 025 is dated the same day at 1630 EST. The record is not clear if Rigsbee and Biglin spoke together about the subject before sending their respective telexes.

Telex 025 stated that information had been received from Customs in Rochester that

[a] lethal form of tear gas looking like talcum powder called "Lance" has been mailed to various government offices. If tasted, it will cause instant death. If smelled, it will cause permanent brain damage.

\* \* \* \* \* \*

Presence in the immediate area where the substance is exposed may cause brain damage.

\* \* \* \* \* \*

All packages received to date are mailed from zip code 11367. . . .

This zip code is Flushing, New York, according to the 1983 Zip Code Directory.

This variation of the rumor appears to lack any basis in fact. No evidence is of record that any packages of "Lance" were ever mailed or ever received by anyone. No Customs telex report was ever presented reporting that "Lance" had been mailed. Because Finn noted in his telex to Rigsbee that he was repeating a telephone conversation—it is unclear with whom—it reasonably can be inferred that this telephone call marked the origin of the rumor that "Lance" had been mailed.

3. *The Identification of "Lance" the Street Drug with Commercial Lance*

The initial confusion of Lance, the commercial product marketed by claimant, and the street substance "Lance" occurred in Alaska, probably during transmission of the test report of the substance obtained in Anchorage. Chemist Schecter needed a control for identifying the substance—a chemical for comparison purposes. Appar-

ently deciding that his most convenient source of CS was commercial Lance, which was used by the Anchorage police, Schecter took a canister and obtained CS by spraying Lance on a flat, polished surface. After the sample of Lance dried, CS remained. Schecter then performed tests that showed the unidentified substance to be CS. His report to Anchorage Metro Narcotics Unit, not in evidence, presumably recounted the above procedure. Whether the names were confused in his report cannot be ascertained. Confusion was fully present in the September 16, 1976 Alaska CIB Bulletin, however, which read:

NARCOTICS INFORMATION

Anchorage Metro Narcotics Unit and Anchorage Police Department have recently run across a substance which has been identified by the laboratory as Lance, a super tear gas of the CS group. There have been three separate contacts with this substance. In all contacts this substance has been wrapped in a small plastic baggie in approximately gram size and fastened with clear or masking tape. REACTION: A person has only to open the container to receive within minutes a severe burning irritation to the eyes and face area which will last up to 20 minutes and becomes worse if the face and eyes are washed with water.

*Information from the laboratory indicates that a person attempting to sniff or inhale the smallest amount could receive severe brain damage. Should it be used intravenously death would result.*

To the officer holding suspects, the opening of such a package could result in sufficient incapacitation to allow the suspects to overcome and endanger the officer or officers. The substance will affect a large area in a short time.

Apparently persons are obtaining this toxic substance by shooting Lance, a commercial product, into talcum powder thus giving the substance a cocaine or china white heroin appearance.

Should one run across a suspect packet, it should be forwarded to the laboratory

unopened and marked, CAUTION, SUSPECTED TOXIC MATERIAL.

(Emphasis added.)

This warning states that the smallest amount of "Lance" sniffed causes brain damage; ingested "Lance" causes death. It is not certain whether the information originated from the Schecter report. The warning identifies the dangerous substance by product name: "Lance, a super teargas of the CS group." This language implicates Lance as itself lethal, because talcum powder is not lethal and the parties did not suggest that the fatal substance results from any synergistic or catalytic effect caused by the combination of Lance and talcum. In his subsequent February 5, 1977 report, Capt. Dean Bivins, Commander of the Alaska CIB, stated that the Alaska CIB Bulletin had confused the street substance "Lance" with commercial Lance.

### 4. The Chain of Dissemination Within the United States Government

The Alaska CIB Bulletin was sent to all Alaska area law enforcement officials and came to the attention of Captain C.B. Elster of the Seattle, Washington police department. Elster sent an exact copy of the warning on September 29, 1976, to "All WANIN Members," which included Hurricane Ridge Facility, Olympic National Park, and Captain Larry Finks, Chief of Law Enforcement for the Pacific Northwest Division of the NPS.

Captain Finks prepared a copy of the Alaska CIB Bulletin as forwarded to him on October 22, 1976. This warning (the "NPS Memorandum"), which merely duplicated the Alaska CIB Bulletin, was sent under signature of Carl C. Lamb, Acting Associate Regional Director, Management and Operations, Pacific Northwest Region, NPS, to the entire Pacific Northwest Region.

The parties stipulated that the NPS Memorandum was communicated by employees of the Northwest Region to employees of the Texas Parks and Wildlife Department. The specifics of this communication are not stated. The parties also stipulated that the Texas Parks and Wildlife Department notified the Organized Crime Task Force, a regional civilian police agency in Killeen, Texas. The specifics of this transmission are unknown.

On or about January 26, 1977, the Office of Enforcement Support ("OES"), Customs, Treasury Department, in Washington, D.C., issued "Customs Message 512," which received nationwide distribution. This message, quoted *infra* pp. 768–69 sparked the nationwide interest in and fear of "Lance." A link between the NPS Memorandum and Customs Message 512 is only inferential. First, Temple, Texas Police Chief Hancock received a copy of the NPS Memorandum when some of his officers returned with it from a one-week training session in Austin, Texas, in early November 1976. Later, in mid-January 1977, Chief Hancock attended a regular meeting of local police officials at which the NPS Memorandum was discussed. According to Hancock, he then related the facts of the Temple incident and the department's inability to verify it. He has opined that misinformation or misunderstanding at this meeting caused the subsequent reports. It is unclear whether representatives of the other local Texas agencies that issued warnings were at this meeting.

Two Texas warnings went out before Customs Message 512. On December 17, 1976, the Texas Department of Public Safety issued the "Lance" warning to its patrol officers. This report stated that "[a] substance called 'Lance', a super teargas of the CS group has been discovered here in the United States, now in Colorado." On an unspecified date in January 1977, Dallas police issued a warning about "Lance" on the basis of "information from other law enforcement agencies." This warning included the NPS Memorandum information about the derivation of "Lance" from "shooting the tear gas into the powder." It also repeated the "china white heroin appearance" wording of the NPS Memorandum.

The next development was the Army Criminal Investigation Division Command Bulletin (the "Army CID Bulletin"), issued

on January 25, 1977. The January 26 Customs Message 512 referred specifically to information from the Army CID. The signator of the Army CID Bulletin, Col. Robert A. Harleston, was Director of Operations for the CID in Washington, D.C., in 1976–77. The Army CID Bulletin states: "On 21 Jan 77, information was received by Ft Hood District, Third Rgn., USACIDC, from the Organized Crime Bureau, Killeen Police Department . . . ." Ft. Hood is a station in the CID network. The Army CID Bulletin reported the substance in Colorado. It further described the report as originating with the FBI in Washington, D.C., and having passed through Customs channels to Killeen. The Army CID Bulletin advised in pertinent part:

2. The substance, "Lance", is believed to be a tear gas of the CS group in a powder-like form resembling talcum powder. Information indicates that the substance is currently being used by illicit drug traffickers to "burn" drug buyers who purchase this substance with the belief that it is either heroin or cocaine. This procedure would then equally apply to covert agents posing as drug buyers. The danger lies in that if tasted, the substance is alleged to cause immediate death, and if sniffed, it is alleged to cause extreme brain damage. In the reported instance, the substance is packaged in small foil or paper square packets, sealed with scotch tape, but could be packaged in other ways. The substance is suspected of producing a burning sensation when touched.

3. "Lance" has also been reported to have been used specifically against law enforcement officers. The alleged procedure commences with an officer stopping a suspect for whatever reason. The substance is then presented to the officer, or perhaps placed in a conspicuous location where the officer will observe it. The hope is that the officer will either taste or smell it in an effort to identify the substance.

The date on which Col. Harleston received the information is uncertain. He testified that, as a matter of course, Ft. Hood would have passed the information along to him when received, on January 21, 1977, although he did not recall the exact date of transmission.

As noted, the source of Ft. Hood's information was unconfirmed. However, both the Army CID Bulletin and the Texas Department of Public Safety memorandum refer to Colorado as a location of "Lance" and to the FBI, Washington, D.C., as the source of the report. Neither of these early reports mentions Temple, Texas. Customs Message 512 was the first to include the Texas incidents. The origin of the reference to Colorado remains without explanation.

The Army CID post at Fort Huachcua, Arizona, passed the "Lance" warning on to the Customs Patrol at Nogales, Arizona. From Nogales the message went to OES, Customs, Washington, D.C., where Customs Message 512 was prepared.

Customs Message 512 was sent to all Customs stations on January 26, 1977. Follow-up reports went out on the same wire service both that same and the following day. Message 512 read as follows:

TO: ALL STATIONS
FM: OES WASH DC
MSG 0512
Pleas Pass to All Personnel
Information has been received from Army CID (at Fort Huachcua AZ) via customs patrol at Nogales, AZ regarding a lethal form of powdered tear gas in talcum form, called "Lance." This substance is whitish & granular & could resemble heroin or cocaine at first glance. If tasted this substance causes instant death; if smelled, it causes irreparable brain damage. Therefore, extreme caution should be exercised with any substance resembling the above description. As additional information is received, it will be disseminated immediately.
FROM OHDC 0009
JAN 26, 1977 1404 Pacific Time

The next day, January 27, 1977, Customs supplemented Customs Message 512 with information derived from Temple, Texas,

and the Army CID at Ft. Hood, Texas. This telex stated:

To: All Stations (Please pass to all personnel)

Reference: MSG # 0512 dated 012677

Subject: Lethal Substance—Lance

The following addtl. information on toxic substance "Lance" has been received:

1) Always comes in air-tight packages (ie.—hermeetically [sic] sealed plastic bags, silver foil, and "baggies" wrapped tightly and completely in scoth [sic] tape.

2) Tasting and/or sniffing may cause fatalities.

3) Presence in immediate vicinity upon opening may cause brain damage.

4) Contact with skin may cause burning sensation. Diluting or washing with water may result in effects described in 2 or 3 above.

5) Advised that any such packages not be opened but submitted to laboratory for analysis.

6) Reference made to possible incident involving Lance on file with Temple, TX PD. Girl in Temple purchased what she believed to be cocaine. Upon sniffing, she was admitted to hospital mentally impaired.

7) Above substance sent to State Dept. of Public Safety Lab in Waco, TX. for analysis. Results not in at present.

8) Temple, TX PD received report on Lance from Dept. of Interior in Colorado indicating its presence there. Other states·reporting are Oregon and Washington.

9) Appears to be directed at killing or impairing one or two types of people—

A) Drug users—sold generally as cocaine; occasionally as heroin.

B) Law enforcement officers—left in plain view. If officer attempts to smell or taste, may cause death or brain damage.

Both Customs Messages are referred to herein as "Customs Message 512."

E. Richard Atkinson was then head of the Analysis Programs and Liaison Branch of the OES. His duties included responsibility for issuing messages like Customs Message 512. According to his testimony, Atkinson heard of the Nogales Customs report from one of his section chiefs on January 26, 1977. Atkinson immediately checked the message with its author in Customs, but did not verify the report with a chemist because the staff chemist had left for the day. Therefore, at 5:03 p.m. on January 26, 1977, a Wednesday, Customs Message 512 was transmitted to all Customs stations. Atkinson testified that he sent the message without extensive verification due to presumed reliability of the source, the Army CID, and the extreme danger posed to his agency's personnel if the rumor were true.

Customs Message 512 was received by the NPS, Olympic National Park. Steven T. Kernes of Olympic National Park sent the message, without attribution to Customs, to Captain Larry Finks, Chief of Law Enforcement for the Pacific Northwest Division of the NPS. The rumor had now traveled full circle. Finks, it is to be recalled, prepared the October 22, 1976 NPS Memorandum. There is no evidence in the record of any liaison between Finks and Kernes regarding the "Lance" rumor. On January 27, 1977, Kernes forwarded Customs Message 512 to all areas of the NPS. This later NPS transmission warned that tasting "Lance" causes death, whereas the earlier version of the NPS Memorandum reported that intravenous use could cause death.

One of the Customs Field Offices that received Customs Message 512 on January 27, 1977, was the station in Blaine, Washington. Immigration and Naturalization Service (the "INS") stations, including the Border Patrol, are often located at the same places as Customs offices. The Border Patrol sector headquarters in Blaine received Customs Message 512, presumably through Blaine Customs. The Blaine Border Patrol station sent Customs Message 512 on January 27, 1977, to Groups 13 and 14, Washington State. It also sent the warning to the twin cities of Minnesota, to Customs in Washington, D.C. (according to joint stipulation), and to all INS Border Patrol section

headquarters. The INS in Washington, D.C., sent Customs Message 512 to all of its regional offices, files control offices, JFK Airport, and the INS in Fresno and Sacramento, California.

The DEA headquarters in Washington, D.C., published its version of Customs Message 512 on January 28, 1977. From what source the DEA headquarters received the warning is somewhat unclear. The United States Embassy in Ottawa, Canada, had sent the warning to the DEA Washington, D.C., Denver, Dallas, Seattle, Tucson, and Vancouver. Whether the Ottawa Embassy received the original Customs Message 512, the Blaine republication, or the INS warning is not in evidence. According to stipulation, the DEA office in Vancouver received the Blaine warning on January 27, 1977.

In any event, on January 28, 1977, the DEA sent a message containing the gist of Customs Message 512 through its El Paso Intelligence Center to all domestic regional and district offices, DEA Mexico City, DEA Caracas, and to the U.S. Coast Guard, Washington, D.C. The DEA message began by stating that its information "was verified by the EPIC Customs representatives on [January 27, 1977]. . . ."

The U.S. Marshals Service (the "USMS") received the "Lance" warning from the St. Louis Customs Office. The USMS sent the message to the INS in Washington, D.C., all INS regional offices, files, controls, INS Fresno, and INS Sacramento.

The parties stipulated that the "Lance" warning was sent on January 29, 1977, to all U.S. Marshals in Regions I, II, and IV. The documents reflect that Customs Message 512 was sent to these addresses from an unnamed region on an unspecified date. On January 31 the U.S. Marshals Service sent a version of Customs Message 512 ("the USMS Telex"), attributed to USMS region III, to Brotherhood of Police headquarters, FBI headquarters, DEA headquarters, all U.S. attorneys, and all USMS region III marshals.

The FBI, according to the testimony of Thomas Francis Kelleher, Inspector and Deputy Assistant Director of the FBI Laboratory for the Scientific and Technical Services Division, on February 1, 1977, sent out a telex in response to the USMS Telex. This telex quoted verbatim the USMS Telex and was sent to all FBI field offices in the continental United States, including San Juan, Puerto Rico; the Hawaiian Islands; and Alaska. Kelleher stated that he was familiar with the qualities of CS. The FBI prepared its message with the notation that the FBI had not verified its contents, that it had been received from USMS, and that the substance "Chemical Lance" was understood to be a one percent CS tear gas.

USPS Telex 025, issued on February 1, 1977, reported that "Lance" had been mailed to government offices. This version was attributed to Customs in Rochester, New York. As noted in the previous discussion, Philadelphia was one addressee of the warning. Additionally, the Rochester Customs warning—which was not itself in evidence—was received by the Rockville, Maryland Post Office. USPS Telex 025 was issued on February 2, 1977, to the Public Health Service (the "PHS") in Rockville. Robert R. Harwick, Director of Administrative Services Center, passed it on the same day to PHS Agency Executive Offices and Staff Office Directors, including Charles Sraver, Director of the Division of Administrative Operations for PHS in Rockville. Harwick's instructions were to "[p]lease alert personnel as you see fit concerning this subject." Mr. Sraver sent USPS Telex 025 to a total of 55 addressees, representing PHS regional offices, hospitals, and clinics.

USPS Telex 025, referring to Customs Message 512, also made its way to the Center for Disease Control (the "CDC") in Atlanta, Georgia. A group of CDC employees—whose various positions do not appear—examined the "Lance" warning "from the U.S. Customs Office at Rochester, New York regarding a 'lethal form of tear gas.'" These CDC employees prepared a "DANGER ALERT" memo, repeating the text of USPS Telex 025, for immediate

conveyance to all CDC personnel, both in and outside of Atlanta.

No CDC employee appeared at trial. Thus no evidence exists of the substance of the CDC's deliberative process, including whether the CDC employees perceived any contradiction between the "immediate death" and "tear gas" elements of the "Lance" warning. On this inadequate record, the hearing officer cannot find that CDC employees—presumably well versed in toxic chemistry—acted either reasonably or unreasonably in sending the "DANGER ALERT" warning on "Lance."

The CDC personnel apparently passed USPS Telex 025 on to the INS. The INS in Washington, D.C., sent the warning to all INS district offices, border patrol stations, and offices in Sacramento, Livermore, El Centro, and Chula Vista, California; Yuma, Arizona; Brooklyn and JFK Airport, New York. The INS, it is to be recalled, had already received Customs Message 512.

USPS Telex 025 also made its way to the FDA in Washington, D.C., from which it was sent on February 2, 1977, under signature of Glenn Kilpatrick, Director of the Division of Federal and State Relations, to all state and FDA agencies.

### 5. *Attempts at Verification and Retractions*

During the circulation of the "Lance" rumor, efforts were made to ascertain its source and accuracy. In all episodes in evidence, the rumor was passed along before verification was complete. Uniformly, the reason given was the threat "Lance" would pose if the rumor were true. Uniformly, all the correspondents of the rumor later relied on the reputation of the source of the warning to mitigate their responsibility independently to verify it.

Neither party attempted to show whether any efforts were made to verify the contents of the seminal October 22, 1976 NPS Memorandum. The message passed out of federal hands through the Texas authorities before the Army CID picked it up.

The Dallas police inquired of NPS's Carl Lamb as to the specifics of "Lance" by letter of January 19, 1977. Part of Dallas' inquiry reflected doubt as to the potency attributed to "Lance:" "The Forensic Science Laboratory of Dallas County has been unable to determine the proper mixture of the [talcum] powder and gas to produce a substance that is as toxic as your memorandum indicates."

Col. Harleston of Army CID testified as to the events surrounding the January 25, 1977 Army CID Bulletin. He stated that the Ft. Hood message probably was in hand on January 21, four days before the CID's national warning; defendant proposes a date of January 23. Although Col. Harleston testified that he did not know that "Lance" (or Lance) was a tear gas, both the Army CID Bulletin and the NPS Memorandum referred to the substance as a "tear gas of the CS group." At the time he sent the Army CID Bulletin, Col. Harleston was unaware of commercial Lance and considered "Lance" to be a street name. Justifying his failure to verify, Col. Harleston was adamant that the nature of the information required immediate dissemination. "Time that might have been spent in verification might have resulted in undue injury or possible death." The Army CID retraction came on February 3, 1977, one day after retractions sent out by the CDC and the PHS.

After issuance of the warning in the Army CID Bulletin, two of Col. Harleston's subordinates, Col. Silver and Mr. Hutchinson, undertook verification. Their efforts uncovered the NPS Memorandum; the business enterprise Lance (claimant); the Alaska incidents; the falsity of the Colorado, Texas, Washington, and Oregon reports; and the purported safety of commercial Lance, all of which were contained in a message of February 4, 1977, sent to the same addresses as the January 25, 1977 message. Thus, a period of 13 days passed from receipt of the Ft. Hood warning, or ten days from the date that the Army CID republished it, before the verified retraction was sent out.

Atkinson's verification before sending Customs Message 512 consisted of confirming Army CID as the source and attempting to query the internal staff chemist, who apparently had left for the day. Contrary to Atkinson's testimony, the day Customs Message 512 issued was a Wednesday, not a Friday. Custom's verification and retraction came on Monday, January 31, 1977, when it sent to the addressees of Customs Message 512 a message to the effect that Lance was not normally harmful. On February 7, 1977, the retraction was given to Associated Press and United Press International. Another retraction followed on February 4, 1977, which stated that "Lance" was not to be confused with Lance.

In the interim the NPS made some effort to track down the source of the reports. On January 27, 1977, Captain Larry Finks contacted Captain Bivins of the Alaska State Troopers, and asked for a copy of the Schecter chemical report referred to in the Alaska CIB Bulletin. Apparently, the recirculation of the substance of the original NPS Memorandum to NPS personnel prompted Fink's inquiry. The Alaska State Troopers were also queried by Frank Farrell, INS, on February 1, 1977.

Customs agent Atkinson began tracing the rumor when the Canadian press questioned him about it. The rumor seems to have spread from INS to the Royal Canadian Mounted Police and thence to the press.

The FBI's attempt at verification and retraction was discussed by FBI official Kelleher. It is to be remembered that although an early version of the rumor attributed the story to the FBI, the evidence shows that the FBI actually did not enter the picture until January 31, 1977. Kelleher checked with Ralph Strickland, Unit Chief of the Toxology Unit, who reviewed the FBI's index for Lance. A reference to a substance identified as "Chemical Lance" appeared. Although this was described as a one percent CS aerosol, Kelleher understood that the substance in the warning was not an aerosol—rather a powder, possibly fatal. The FBI knew that commercial Lance was safe. The FBI warning had noted that the

FBI had not tested the material, but also stated that upon information it was CS.

Once he had information from the DEA that the Temple, Texas substance was CS, Kelleher issued a clarification, apparently on February 3, 1977. This message distinguished the Temple substance from commercial Lance and affirmed that the CS aerosol was not fatal or injurious. The message received the same distribution as the FBI warning.

The USPS attempts at clarification center around official Biglin, of the Eastern Regional Office, the person principally responsible for issuing USPS Telex 025. As stated earlier, Biglin sent the telex within 45 minutes of its receipt on February 1, 1977. Biglin then received within the hour information from the Postal Inspection Service that USPS Telex 025 was unsubstantiated. He telephoned those recipients of his message whom he could reach that day and authorized a telex to be sent on February 2, 1977, confirming his telephonic clarifications.

The PHS's verification and retraction efforts center around Mr. Sraver of the PHS in Rockville. He acted within the hour of receipt of Biglin's telex to send his warning. Although Biglin stated that his retraction followed on the heels of his warning, Sraver testified that he did not learn of the error until two days later. Although Sraver's retraction came immediately thereafter, it was addressed to only two addresses, the collective "PHS Agency Executive Officers" and "PHS Staff Office Directors."

Testimony as to the verification and retraction processes of other involved agencies does not appear in the record. The parties, however, stipulated that the evidence is cumulative. The following additional retractions have been documented:

The Department of Health, Education and Welfare ("HEW") (PHS) (FDA) on February 3, 1977, issued a retraction to Regional Food and Drug Directors, District Directors, and the FDA Resident Inspection Posts stating that no confirmation of any injuries had been received and giving instructions to "hold up any public releases

until the situation is clarified." Later the same day the same agency sent a message to the same addresses stating that the "allegation is completely unsubstantiated and therefore should · be disregarded." This message repeated the USPS's retraction of USPS Telex 025.

HEW (PHS) (FDA) also sent a retraction memorandum on February 3, 1977, to Assistant Associate Commissioners, Office Directors, Bureau Directors, Bureau Executive Officers, and their General Counsel under signature of J. Donald Henson, Director, Policy Management Staff. This memorandum states that the FDA had republished on February 2 the USPS Telex 025 warning which, it recounts, had been retracted by the USPS on February 3.

The Secret Service sent a notice on February 3, 1977, disavowing the attribution of any lethal qualities to Lance. This telex, addressed to "All SAIC's and Resident Agencies," attributes the information to the INS. This telex also puts forth the explanation that "Lance" ·was created in the street to simulate hard drugs, possibly to burn drug buyers financially. A more informative telex followed the next day.

On February 4, 1977, the Temple, Texas police department issued a request for nationwide distribution of an explanatory message that no confirmed incidents involving "Lance" had occurred in Temple. Of course, defendant was not a party to this local-origin telex. The CDC on February 4, 1977, issued a retraction based on the USPS retraction of USPS Telex 025. The PHS, apart from the FDA's retraction noted earlier, sent under signature of John C. Droke, Director, Office of Administrative Management, on February 4, 1977, the USPS retraction of Customs ·Message 512 to PHS Agency Executive Officers and Staff Office Directors. On February 4, 1977, the El Paso Intelligence Center of the INS issued a retraction.

The DEA issued a repudiation of the rumor in its "Weekly Digest of Narcotics Intelligence" for the week ending February 4, 1977. The USMS on February 4, 1977, issued a telex, in reference to its republica-

tion of the rumor, stating that "federal agencies which disseminated this information have further advised us . . . [of the confusion of "Lance" with Lance and of the safety of the latter]."

*Held's Testimony*

Plaintiff's principal witness was Ira Held, president and owner of claimant, who testified at length as to his experience with the alleged disparagement of commercial Lance by the federal government and the damage it caused to his business. The hearing officer finds the facts consistent with Held's testimony, unless otherwise noted.

According to Held, the first information he had of a problem with Lance came in November 1976. He received a telephone call from Houston, Texas, from a customer who said that a policeman who had casually visited his store had confiscated a counter display of Lance. Another incident came to Held's attention through a telephone call from New Orleans, Louisiana, reporting that a policeman ordered a customer to take Lance off the counter.

In December 1976, Held began to receive cancellations of orders for Lance. These cancellations did not worry him unduly, because he was planning to use the Affiliated Drugstore Operators Association trade show in Chicago in February 1977 to consolidate and expand the market for Lance. At this time, it is Held's testimony that he was unaware of any telexes or letters or reports circulating around the country concerning his product or any substance known as "Lance."

Held was in Nashville, Tennessee, on January 31, 1977, in his office, when two federal agents from the Treasury Department, Drug Enforcement Division requested and obtained from Held a copy of the formula of Lance. On February 1, 1977, newspapermen told Held that articles concerning the Lance rumor were appearing in newspapers around the nation. After some unspecified telephone inquiries, Held contacted Capt. Bivins, in Alaska, who told him that federal government bulletins on "Lance" were in circulation.

Held also communicated with the Treasury Department and the DEA. As of this time he had not received any calls from any federal government agencies concerning the toxic content of Lance or advice as to circulation of telexes. Held sent a telegram on February 1 demanding a retraction of the telex warnings. Sometime later Held received a call from one of the government agents who had corresponded with him concerning the "Lance" rumor then-Maj. Brigham Schuler, Chief of Public Affairs, Army CID. According to Held's testimony, Maj. Schuler promised to come in February to the drug show in Chicago and to hold a press conference with Held in order to speak on behalf of claimant. Held arranged the press conference, but at the appointed hour, Maj. Schuler did not appear.

In rebuttal[3] Col. Schuler contradicted Held's version of events. The hearing officer deems Col. Schuler's testimony more credible in the circumstances and finds that no promise was made to appear at the drug show in Chicago.

Many news articles in the national and regional press publicized the "Lance" rumor beginning in early February 1977. Cancellation of orders for Lance followed the circulation of and publicity given to the "Lance" rumor, with the demise of the product occurring in 1978.

*Damages*

The parties stipulated to damages of $500,000. The hearing officer, as fact finder on behalf of the Senate, required the parties to explain in their post-trial briefs the basis for the stipulated amount.

In addition to the briefs concerning the stipulated amount, both sides put on evidence concerning the worth, growth, and decline of claimant. Defendant also elicited from Held on cross-examination evidence of his business experience prior to the inception of claimant, which consisted of a number of business failures.

---

**3.** Defendant permissibly called Col. Schuler as a rebuttal witness without having given earlier

a. *Held's Business Experience*

Held attended the University of Miami and entered the business world in 1969. His first job after college was with the Union Underwear Co., where he worked for two or three years. He then went to work for Xerox Corporation. His final position at Xerox was Area Regional Manager. In 1974 Held left Xerox with an associate to form a company called Marketing Research Corporation of America. This business was involved in the sale of copying machines. A year and one half after Held left this business in 1973, it failed. Held then worked for Bernard Salzman in Nashville, Tennessee, as a salesman for five or six months. Thereafter, Held opened a nightclub in Nashville called "Hap Holiday's." After staying in this business for a year, Held sold his nightclub; it does not appear whether he sold it at a profit or a loss. Held next took over a business called "H & R Masonry Co." after the owners of that company failed to pay off debts they owed him. This business failed and Held declared bankruptcy in 1974.

In 1975 Held took over claimant. Although certain exhibits reveal that Lance Industries, Inc., produced chemical Lance as far back as 1971 and Held acknowledged that claimant was a preexisting company, Held suggested that chemical Lance came from another source. He testified that along with Aubrey Harwell, Joel Berlin, and Sam Martz, he formed a corporation called HBH. Martz' wife owned 25 percent of a company called LFR which stood for "Let Freedom Ring." According to Held, LFR marketed "Chemical Lance." Held changed the marketing strategy which had been door-to-door sales to national marketing through major discounters and drug store chains. In 1975 Held bought out his partners.

b. *The Stipulation of Damages*

Claimant states that it purchased 50,000 cartons of Lance. Held testified that each

notice that he might testify.

carton contained two dozen units (claimant's post-trial brief has each carton containing one dozen); each unit was to wholesale for $2.75 and retail at $5.00. Through an undisclosed calculation, claimant concludes that these figures produce a per unit profit to claimant of $1.931. Held testified that the production cost was $.42 per unit. Claimant lists 15 outlets through which the cartons were to be sold. The extent of the commitments to buy, however, is not shown. Claimant concludes that termination of these commitments produced a loss of $1,158,600.

The suspect figure is the $1.931 per-unit profit figure. Claimant also states that its international sales market lost contracts for sale of 20,000 units in Spain and 12,000 units in London. This loss is calculated to equal $409,372.00. The number of units (32,000) times $1.931 equals $61,792.00. Even if claimant has misspoken and intended to state cartons, each containing a dozen units, the number is $741,504.00, not $409,-372.00.

The parties' comments on negotiation of the stipulated damage amount are more understandable. Claimant's petition alleged damages in the amount of $3,010,000, reflecting loss of past, present, and future sales of Lance. Defendant's discovery regarding this figure included examining the books and records of claimant and deposing Held and Kenneth Kraft, CPA, claimant's accountant since 1978. The FBI's inspection of claimant's books and records was limited to verifying the accuracy of the numbers set forth therein. Defendant also retained the services of a Dr. Edward Kaitz, former dean of Georgetown University Business School, to analyze claimant's damage claims. According to defendant, the $3 million figure was high.

Claimant suggested a stipulation at a particular figure. Defendant demurred. In conjunction with Kaitz, defendant calculated a new figure which was too low for claimant. Defendant then added what it considered to be a fair figure reflecting its cost for further analysis and the costs of courtroom presentation by Kaitz. Claimant also developed new damage figures. Within this framework counsel for the parties negotiated the stipulated damages.

## DISCUSSION

### Scope of the Congressional Reference

A complication has arisen because the Claims Court has been directed to examine a claim sounding in negligence, although the law of torts traditionally views a cause of action such as claimant's as based on the intentional tort of disparagement and, specifically, disparagement by republication of defamatory matter not originating with the republisher.

Libel is the intentional tort of defamation in writing of a person or entity. See W. Prosser, The Law of Torts §§ 111, 112 (4th ed. 1971). Disparagement is an intentional tort of defamation having as its object a product rather than a person or entity. Id. § 128. Although the two actions are similar, each evolved from a different area of the law—defamation from libel and slander, disparagement (also known as injurious falsehood) from an action on the case. Restatement (Second) of Torts § 623A comment g (1977). Disparagement requires knowledge of the falsity of the statement or action in reckless disregard of the truth of the statement, id. 623A; defamation's fault requirement can be met by a showing of mere negligence. Id. §§ 558(c) (defamation generally); 580(c) (defamation of a private person).

Misrepresentation, also an intentional tort, requires as one element that claimant rely to his detriment on the misrepresentation. Id. § 108. See generally Jiminez-Nives v. United States, 682 F.2d 1, 4–5 (1st Cir.1982) (false information in social security file which led to terminated payments was not misrepresentation because not made to plaintiff and plaintiff did not rely on it). To make out a case of negligent misrepresentation, a claimant must also show damage caused by reliance on the misrepresentation. Ware v. United States, 626 F.2d 1278, 1282 (5th Cir.1980) (Government destroyed cattle after negli-

gent misdiagnosis; "[T]he tort of misrepresentation demands some act, the result of justifiably relying on the misrepresentation."); *accord Rey v. United States,* 484 F.2d 45, 49 (5th Cir.1973) (reliance shown by plaintiffs destroying hogs when Government negligently misrepresented that they were diseased); *Hall v. United States,* 274 F.2d 69, 71 (10th Cir.1959) (reliance shown by plaintiff selling cattle at below market price based on Government's negligent misrepresentation that the cattle were diseased). This is not a claim based on intentional or negligent misrepresentation, because claimant took no action in reliance on defendant's republications of the "Lance" warning.

Defendant argues that the claimant has failed to establish any intentional tort committed by the Government. The claimant rejoins that the Senate's reference in S. 3451 delimits the Claims Court's inquiry to determining the merits of a claim "for damages suffered by . . . [the claimant] as the direct and proximate result of negligent transmission and publication of false information concerning the company's principal product . . . ." The accompanying report, S.Rep. No. 95–1356, 95th Cong., 2d Sess. (1978), did not suggest that Congress wanted the hearing officer's inquiry to embrace an intentional tort:

> In light of the damage done, however inadvertently to this once promising industry, it would seem appropriate to allow Lance to establish the merits of its claim against the Government in the Federal Court of Claims and, as well, allow that court to determine the extent and amount of damages.

*Id.* at 2.

The hearing officer deems unpersuasive the Government's argument that the language of the Senate Bill should be ignored and that claimant should be held to establish the elements of the intentional tort of disparagement. Because the Senate bill specifies a negligence claim, but the claim does not qualify as one for negligent misrepresentation, as discussed above, it becomes necessary to identify the nature of

the cause of action the hearing officer is to examine.

■ Defendant concedes that the claim can be viewed as sounding in simple negligence. Def's Post-trial Br. at 36–37. In analyzing a negligence cause of action, however, defendant seeks to defeat the claim based on a qualified privilege. Qualified privileges arise in the context of intentional, not negligent torts. The only productive course, in the view of this hearing officer, is to evaluate the claim as one for simple negligence, as requested by the reference and agreed to by defendant, although drawing from the law of the intentional tort of disparagement by analogy to help define the elements of this novel negligence claim.

The difficulty with the course the hearing officer has charted is that disparagement is not customarily viewed as a negligent tort. Similarly, in *Jimenez-Nieves v. United States,* 682 F.2d at 6, the First Circuit declined to entertain a negligence theory of action—not barred by the Federal Tort Claims Act—when the gravamen of the complaint was defamation, which was barred, although the court noted that defamation can be caused by negligence: "[W]e do not believe that the fact that a defamation is caused negligently makes it any the less a defamation." (citing Restatement (Second) of Torts § 580B(c)). *Jimenez-Nieves* thus supports the proposition that a cause of action sounding in defamation cannot be recast to sound in negligence.

The hearing officer can only infer that the reason why the reference prescribed examination of a cause of action based on negligence was to absolve claimant from the necessity of showing that the Government acted knowing the falsity of the "Lance" rumor or with reckless disregard for its truth or falsity, which are the mainsprings of the *prima facie* intentional tort of disparagement.

*Jurisdiction*

Another reason for proceeding within the ambit of negligence law is jurisdictional, although the parties have not made juris-

diction an issue in this case. *Aleut Tribe v. United States,* 702 F.2d 1015, 1017 (Fed.Cir. 1983) (citing cases).

█ This court cannot entertain a reference that conflicts with the jurisdiction conferred by the statute establishing jurisdiction in this court to hear a reference. *See Ford v. United States,* 19 Ct.Cl. 519 (1884), *cert. denied,* 116 U.S. 213, 6 S.Ct. 360, 29 L.Ed. 608 (1886). In *Ford* the Court of Claims dismissed a congressional reference claim for lack of jurisdiction based on the statute of limitations, because the statute authorizing the referral deprived the court of jurisdiction over any claim barred by any law of the United States.

Strong indication exists that the statute in which Congress provided for congressional reference to this court does not contemplate waivers of meritorious defenses. 28 U.S.C.A. § 2509(c) (West Supp.1983), reads:

> The hearing officer to whom a congressional reference case is assigned by the chief judge shall proceed in accordance with the applicable rules to determine the facts, including *facts relating to delay or laches,* facts bearing upon the question *whether the bar of any statute of limitations should be removed,* or *facts claim to excuse the claimant for not having resorted to any established legal remedy*
>
> . . . .

(Emphasis added.) (The version of section 2509 in effect when S. 3451 was enacted contains language identical to that underscored.)

Traditionally, matters subject to congressional reference have been those for which Congress has charged this court's predecessor, the United States Court of Claims—through its trial division—to determine the merits of a claim unimpeded by "one or more extra-meritorious defenses that accrue to ... [the Government] by virtue of its sovereign status." *Burt v. United States,* 199 Ct.Cl. 897, 906–07 (1972). Such defenses typically are the statute of limitations and laches, but not necessarily the defense of sovereign immunity.

The Federal Tort Claims Act, 28 U.S.C. § 2674 (1976), waives the sovereign's immu-nity for, *inter alia,* negligent torts. Section 2680(h) excepts from the waiver "[a]ny claim arising out of ... libel, slander, [or] misrepresentation ...." The Supreme Court has held that section 2680(h) comprehends claims arising out of negligent misrepresentation. *United States v. Neustadt,* 366 U.S. 696, 702, 81 S.Ct. 1294, 1298, 6 L.Ed.2d 614 (1961).

In *O'Donnell v. United States,* 166 Ct.Cl. 107 (1964), the reference was to examine the merits of a claim based on the negligent failure of an official of the Department of Agriculture to advise all interested parties that importation of potatoes affected by ring rot was barred by Swedish import regulations. The claimants exported potatoes to their loss. The full Court of Claims rendered its opinion that the claimants had no legal claim against the United States because the Federal Tort Claims Act "specifically exempts from its purview '[a]ny claim arising out of ... misrepresentation,'" 166 Ct.Cl. 109, and that no equitable right to recover existed because the claimants and Swedish officials were as negligent as the Department of Agriculture officials. 166 Ct.Cl. at 118. In his concurring opinion, 166 Ct.Cl. at 119, Judge Whitaker commented:

> Even if there had been a positive misrepresentation by some Government official, a failure to disclose what defendant was under a duty to disclose, Congress has expressly said the United States is not liable therefor. Considering all the pros and cons, and balancing the public interest against individual injury, *Congress decided that right and justice dictated that no individual should recover damages from his Government for that sort of thing. If the public generally cannot recover, how can it be "equitable" to permit some special individual to do so,* absent some special circumstance applicable to this particular individual and not to the general public. . . .

(Emphasis added.) This dictum has equal application to a claim against the Govern-

ment based on the intentional tort of disparagement.[4]

Because section 2509(c) does not contemplate removal of merits defenses, the view of the *O'Donnell* concurrence derives substance from the statute allowing this court to render its advisory opinion.

■ The trial commissioner in *Sperling & Schwartz, Inc. v. United States,* Cong.Ref. No. 1–74 (Ct.Cl.T.C. Nov. 21, 1977), *adopted mem.* (Ct.Cl.Rev.Panel July 20, 1978), 218 Ct.Cl. 625 (1978), which involved a Food and Drug Administration press release warning against the use of claimant's dinnerware, took a different view. Recovery was not recommended because the FDA did not cause the alleged libel or damages. The trial commissioner disallowed specifically the defense of absolute privilege, recognized in *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1969), which shields a government agency from liability for an employee's statements made in his official capacity. The trial commissioner explained that "the 'privilege' doctrine of *Barr* ... is akin to the doctrine of sovereign immunity." Slip op. at 14. Thus, under *Sperling & Schwartz,* a congressional reference waives privileges that are tantamount to sovereign immunity.

The issue of whether defendant can assert a privilege as a defense in a congressional reference case need only be resolved, however, if the present reference is to proceed as a claim for disparagement or intentional or negligent misrepresentation. Likewise, only if disparagement or intentional or negligent misrepresentation is to be examined must this hearing officer determine whether to rule that a claim barred by the Federal Tort Claims Act cannot be heard because a government privilege is not an "extra-meritorious defense" waivable by a congressional reference or that a congressional reference waives the defense of governmental privilege.

As a practical matter, if the reference asked this court to examine the intentional tort of disparagement, claimant could not make out its *prima facie* case. According to the Restatement of Torts (Second) § 623A, plaintiff would have to prove intentional falsity or reckless disregard for the truth of the disparagement. The facts, as reported by the hearing officer, do not support a finding that any government player knew of the falsity of the "Lance" rumor or that defendant's actions could be characterized as showing reckless disregard for the truth of the warning. In addition to a direct reference to the product and publication, the other elements of disparagement—causation and damages, however have been satisfied. *See infra* note 6.

4. Subsequently, in *Mizokami v. United States,* 188 Ct.Cl. 736, 414 F.2d 1375 (1969) (per curiam), the court granted relief, apparently based on a theory of negligent misrepresentation, for the Food and Drug Administration's erroneous condemnation of two carloads of spinach shipped by claimants (even though the court's discussion revealed no steps taken by claimants in reliance on the FDA's negligent misrepresentation that the spinach was contaminated). The court did not receive the reference pursuant to 28 U.S.C. § 2509, however, but through a special jurisdictional act conferring jurisdiction to hear and determine a claim "based upon damages and losses allegedly sustained as the result of erroneous determinations by the [FDA] ...." 188 Ct.Cl. at 740, 414 F.2d at 1376. The bill was construed as a waiver of sovereign immunity otherwise assertable under the Federal Tort Claims Act. 188 Ct.Cl. at 741, 414 F.2d at 1377.

Nine years later the review panel in *Marlin Toy Products, Inc. v. United States,* Cong.Ref. Nos. 2–74 & 1–75 (Ct.Cl.Rev.Panel Dec. 19, 1978), 218 Ct.Cl. 630 (1978), adopted the trial commissioner's recommendation to advise Congress that the claimant had an equitable claim against the Government, again apparently based on negligent misrepresentation. *Id.* (Ct.Cl.T.C. Sept. 29, 1978). This case also is devoid of any acts taken by the claimant based on misrepresentations; rather, the damage, lost Christmas business, flowed from the Consumer Products Safety Commission's erroneous mislisting of claimant's product on the banned list.

Despite the contrary indications in *Mizokami* and *Marlin Toy,* the cause of action to be examined in this congressional reference is not negligent misrepresentation because the element of reliance is lacking, as discussed above. Assuming that it were present, the issue would remain whether Congress by this reference has waived its sovereign immunity under § 2680(h) of the Federal Tort Claims Act, which otherwise reserves immunity for negligent misrepresentation. *See infra* p. 778.

### The Claim Based on Negligence

The hearing officer's task of delineating the appropriate inquiry has been assisted by Judge Yock's recent discussion in *Shane v. United States*, 3 Cl.Ct. 294 at 303 (1983), *adopted mem.* (Cl.Ct.Rev.Panel Nov. 1, 1983). The question in the reference at bar is whether the claimant has an equitable claim against the United States based on the alleged negligence of various agencies of the Government.[5] The word "equitable" has been interpreted in the context of congressional reference as denoting a broad moral responsibility on the Government's part. *See Burkhardt v. United States*, 113 Ct.Cl. 658, 666–68, 84 F.Supp. 553, 558–59 (1949). *But see Burt v. United States*, 199 Ct.Cl. at 906. The prevailing view is that a claimant must show a wrong attributable to the Government and damage to the claimant caused by that wrong. *See, e.g., Shane,* at 303; *Innocent Victims of the Occupation of Wounded Knee v. United States*, Cong.Ref. No. 4–76, slip op. at 32 (Ct.Cl.T.C. June 10, 1981) (LYDON, T.C.), *adopted mem.* (Ct.Cl.Rev.Panel Dec. 15, 1981); 229 Ct.Cl. 465 (1981).

The familiar four elements making up a cause of action for negligence in the context of this case are, first, a duty to conform to a standard of conduct that protects law enforcement personnel, federal employees, and the public against unreasonable risk, on the one hand, and a manufacturer against unreasonable risk of its product being disparaged, on the other. Perhaps a more precise formulation of the Government's duty in a case such as this is to warn against a perceived hazard in a manner that does not unreasonably jeopardize the interests of a product's manufacturer.

The Government does not contend that the first of the duties was absent, arguing "[T]he actions taken were expressly for the purpose of protecting other law enforcement personnel, federal employees, and the general public from a potentially severe risk." Def's Post-trial Br. at 36–37. A separate duty to a manufacturer of a product which is the subject of a governmental warning appears to be conceded, because defendant argues solely that claimant has failed to prove breach of duty and causation.

Second, defendant must have failed to conform to a standard of due care in protecting those to whom the duties are owed against unreasonable risk. *See Beins v. United States*, 695 F.2d 591, 605–08 (D.C. Cir.1982) (Air Force held to standard of due care in supplying accurate materials to evaluators of pilot's condition).

Faced with the "Lance" warning, the government agents were confronted with information that was both alarming and incredible. The concept of instant brain damage upon coming into contact with any substance is alarming. The concept of instantaneous death on ingestion of any substance reasonably excites concern. The "Lance" warning, however, was not in every case reissued immediately upon receipt. Some law enforcement agencies knew CS and its effects and reissued the warning without pause. Some of the agencies had testing laboratories that were not consulted. The government agents' precipitate actions were motivated, nonetheless, by the legitimate concern of protecting against a perceived imminent danger.

The government agents were not issuing a warning in the first instance. The "Lance" warning emanated originally from law enforcement officials in Alaska; information from Texas state law enforcement officials was added to the warning. Although it was embellished with each republication, the "Lance" warning derived from a state law enforcement authority on which many of the federal agencies involved, *e.g.,* the FBI, Customs, and the Army CID, must and do rely. In almost every case, the

---

5. Assuming that the tort of negligence comprehended claimant's cause of action other than in the context of this congressional reference, technically claimant had a legal right to sue under the Federal Tort Claims Act, but failed to file timely due to incorrect advice by the Library of Congress, Congressional Reference Service, that its claim was barred by 28 U.S.C. § 2680(h).

republishers identified the rumor as from another source.

That no steps were taken by any federal agency to verify the "Lance" warning despite the admitted familiarity of several agencies with CS does not amount, in the circumstances, to a lack of due care. The timeliness, form, and dissemination of retractions also are consistent with the exercise of due care.

*Medico v. Time, Inc.*, 509 F.Supp. 268, 272–73 (E.D.Pa.1980), *aff'd*, 643 F.2d 134 (3d Cir.), *cert. denied*, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981), provides an instructive analogy. Plaintiff's libel action claimed that *Time* magazine had erroneously labeled him an underworld criminal figure. The magazine had reported that a conversation tape recorded by the FBI, but not made public by the FBI, contained dialogue referring to plaintiff as a chief of a Mafia family. The court granted defendant's motion for summary judgment on the basis of a privilege, relying on Pennsylvania's adoption of section 611 of the Restatement (Second) of Torts. This section reads:

> The publication of defamatory matter concerning another in a report of an official action or proceeding of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.

The court in *Medico* held that "the mere fact that a government report has not been made public does not make it less of 'a report of an official action or proceeding' ... for purposes of the section 611 privilege to republish a defamation." 509 F.Supp. at 279. Under *Medico* republication of a report of an official action by a state or federal government agency would be reasonable.

The hearing officer must conclude that the Government committed no wrong with respect to claimant because the government agents did not breach a duty of due care by republishing the "Lance" warning.[6]

### CONCLUSION

Based on the foregoing, claimant has established no legal or equitable claim against the United States; consequently, a payment to claimant would be a gratuity.

---

**6.** The remaining two elements of the tort of negligence are proximate cause and actual injury. *See* W. Prosser, *Law of Torts* § 30. Because no breach of duty is found, causation and damages are discussed only in order to provide a complete report. The evidence establishing proximate cause is compelling. Although Held perhaps had his first major success in Lance Industries, Inc., defendant cannot gainsay the fact that claimant's business was ruined as a result of the widespread reiterations of the "Lance" warning. Lance was confiscated from stores by policemen; it was the subject of newspaper articles raising the alarm; product orders were cancelled soon after the warnings were issued and the attendant publicity ensued. Certainly, defendant cannot deny Held's persistent efforts to obtain clarification and retraction from the Government. Held took reasonable steps to rehabilitate his product. Although defendant faults him for giving up, the evidence provides no basis for a conclusion that the causation of the injury was other than direct and proximate.

The parties stipulated the amount of damages, notwithstanding defendant's contention that the claimant failed to prove causation.

The stipulated figure is $500,000. Defendant insists that this stipulation, arrived at by compromise, be honored. The hearing officer disagrees. The $500,000 figure derives from projected lost profits. While it is true that the "Lance" rumor ruined claimant, it remains a fact that Lance's projected success in a highly competitive market is conjectural. Claimant enjoyed only a brief period of profitable operations before falling prey to the "Lance" warning. Were an award recommended, the record would support a figure of $250,000.